UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NATALIE GARNETT-BISHOP, et al.,

             Plaintiffs,

      -against-

NEW YORK COMMUNITY BANCORP, INC.,
and NEW YORK COMMUNITY BANK

             Defendant.
-------------------------------------------------------X

**FILED**
**CLERK**

10:02 am, Mar 02, 2017

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF
DECISION & ORDER**
12-cv-2285 (ADS) (ARL)

<u>**APPEARANCES:**</u>

**The Law Office of Patrick W. Johnson**
*Co-counsel for the Plaintiffs*
9118 Third Ave
Brooklyn, NY 11209
      By:    Patrick W. Johnson, Esq., Of Counsel

**Pavlounis & Sfouggatakis**
*Co-counsel for the Plaintiffs*
7706 13th Avenue
Brooklyn, NY 11228
      By:    Andrew G. Sfouggatakis, Esq., Of Counsel

**Littler Mendelson**
*Attorneys for the Defendants*
290 Broadhollow Road
Suite 305
Melville, NY 11747
      By:    Amy Laura Ventry-Kagan, Esq.,
              Robert M. Wolff, Esq.,
              James P. Smith, Esq.,
              Linda H. Harrold, Esq., Of Counsel

**SPATT, District Judge**:

      Thirty-one Plaintiffs originally brought five separate actions against the Defendants New

York Community Bancorp, Inc., and New York Community Bank (the "Defendants" or "NYCB").

The Court consolidated the five actions, and upon a motion by the Defendants, dismissed several

of the Plaintiffs' various causes of action as well as several of the Plaintiffs. Presently, there are 25 Plaintiffs. All 25 Plaintiffs have causes of action against the Defendants for alleged violations of the federal Worker Adjustment and Retraining Notification Act (the "federal WARN Act"), 29 U.S.C. § 2101 *et seq.,* and the New York State Worker Adjustment and Retraining Notification (the "NYS WARN Act") Act, N.Y. Labor Law § 860 *et seq.*. Seventeen of the Plaintiffs have causes of action for gender discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL"). The Plaintiff Natalie Garnett-Bishop (Garnett-Bishop) has causes of action for discrimination based on gender, age, and race in violation of the NYSHRL, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (the "ADEA").

Presently before the Court are two motions: a motion by the Plaintiffs for summary judgment pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56 for judgment as a matter of law on their NYS WARN claims; and a motion by the Defendants for summary judgment pursuant to Rule 56 dismissing all of the Plaintiffs' claims. For the following reasons, the Court grants the Defendants' motion in its entirety, and denies the Plaintiffs' motion in its entirety.

## I. BACKGROUND

### A. Relevant Procedural Background

Five separate actions were brought against the Defendants, as well as several individual Defendants who were eventually dismissed from the action. These actions arose from NYCB's decision to reduce its workforce (the "RIF") on October 13, 2011 by terminating approximately 320 employees.

On January 8, 2014, the Court granted the Defendants' unopposed motion pursuant to Rule 42 to consolidate the five separate actions. The Court also directed the Plaintiffs in those five actions to file a consolidated complaint combining these claims and stated that the "[c]onsolidated [c]omplaint shall not assert new allegations against the Defendants." The cases were consolidated as one action under Case Number 12–CV–2285, which was the first of the five lawsuits to be filed, and the other four cases were closed. In addition, the Court dismissed without prejudice all pending motions with leave to renew after the Plaintiffs filed a Consolidated Complaint.

On February 7, 2014, thirty-one Plaintiffs, all of whom were employees of the Defendants whose employment was terminated, filed a consolidated complaint. The consolidated complaint alleged, among other matters, that their terminations were the result of employment discrimination based on age, race, national origin, gender and/or disability and retaliation in violation of Title VII; the ADEA; and the ADA. The Plaintiffs also asserted claims pursuant to the federal WARN Act and the NYS WARN Act. The Plaintiffs further asserted state law causes of action against the Defendants for violation of the NYSHRL, intentional infliction of emotional distress, and negligent infliction of emotional distress.

On November 6, 2014, the Court issued a Memorandum of Decision and Order dismissing: all claims except: 1) Garnett Bishop's claims that her termination was based on gender, age, and racial discrimination in violation of Title VII, the ADEA, and the NYSHRL; 2) seventeen Plaintiffs, Maria Alexander, Donna Berchiolli, Shannon Byrnes, Donna Cappello, Mary Ellen Cassidy, Theresa Falco, Nansi Ghobrial, Celeste McCormack, Leslie Morency, Monica Ortega, Katia Page, Candice Petrancosta, Addorolata Quiles, Jacqueline Ramos, Gelsomina Tierno, Samantha Zielinski and Audrey Zuckerman (collectively, the "Cappello Plaintiffs"), claims that their pay, promotions, and salaries were the result of gender discrimination in violation of the

NYSHRL Plaintiffs; and 3) the claims brought by Garnett-Bishop, the Cappello Plaintiffs, and Plaintiffs Helen Arniotis, Ilene Branfman, Claire Byrnes, Geraldine Collins, Dee Cooper-Jones, and Gina Decrescenzo (collectively "Cooper-Jones Plaintiffs") alleging that they were not properly notified of their pending terminations in violation of the federal and NYS WARN Act.

On May 6, 2016, the Plaintiffs filed a motion for summary judgment on their NYS WARN Act claims. The Defendants filed a cross-motion for summary judgment to dismiss all of the Plaintiffs' claims.

**B. Factual Background**

### 1. As to the Defendants' 56.1 Statement and the Plaintiff's Purported 56.1 Statement

The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rule(s)") direct parties moving for summary judgment to file a "short and concise statement . . . of the material facts to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). Parties who oppose the motion are similarly directed to respond to each numbered paragraph, and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by FED. R. CIV. P. 56(c)." Local Rule 56.1(d).

Federal Rule of Civil Procedure 56 states that a party who either asserts or disputes a fact must support that assertion by "citing to *particular* parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added).

Here, the Plaintiffs have failed to follow the directives of Local Rule 56.1 and FED. R. CIV. P. 56(c). The Plaintiffs' response to the Defendants Statement of Uncontested Facts is 163 pages

long.  The Defendants listed 429 enumerated paragraphs, and the Plaintiff "responded" to each of those.  Although the Plaintiffs disputed almost every one of the Defendants' 429 paragraphs, the Court was unable to find a single instance where the Plaintiffs cited to a particular piece of evidence in support of their denial.  Most of the Plaintiffs' responses directed the Court to "[s]ee the plaintiff's testimonies and their filed complaints with the Court and the Equal Opportunity Employment Commission."  Some of the Plaintiffs' responses do not even contain that "citation" and blindly dispute the Defendants' assertions.

While this Court could ostensibly conduct an exhaustive review of the record, it declines to do so here.  Rule 56 *does not* require the Court "to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir. 2002) (citations omitted); *see also Giannullo v. City of New York*, 322 F.3d 139, 145 (2d Cir. 2003) (stating that the purpose of Local Rule 56.1(d) "is to free district courts from the need to hunt through voluminous records without guidance from the parties") (internal citations and alterations omitted).  "Rather, the party opposing the summary judgment motion has the obligation to point to admissible evidence in the record in support of any claim that there is a disputed issue of material fact." *Arline v. Potter*, 404 F. Supp. 2d 521, 527 (S.D.N.Y. 2005).  The Plaintiffs failed to point to disputed issues of fact in the Joint 56.1 Statement.

The record consists of approximately 4,000 pages.  There are 24 Plaintiffs, each of whom "filed" something with the Court.  There are depositions from 18 Plaintiffs, as well as several NYCB employees.  There are affidavits from dozens of individuals.  There are hundreds of pages of evaluations, disciplinary records, salary records, employment records, and other records.  The Plaintiffs fail to cite to a single specific piece of evidence, or even to a particular plaintiff, to support their propositions.  Their blanket directive to "see the [] testimonies and [] [] complaints"

will be deemed an admission wherever the Defendants' statements are supported by admissible evidence. Even the Plaintiffs' list of additional facts in dispute are not supported by direct citations to admissible evidence. Here too, on *every* statement of additional facts in dispute, the Plaintiffs directed the Court to "[s]ee the plaintiffs' testimonies and their filed Complaints with the Court and the Equal Opportunity Employment Commission." As the Defendants' 56.1 Statement does greatly rely on the Plaintiffs' depositions, the Court is able to "see the testimonies of the Plaintiffs."

Therefore, the Court will deem the Defendants' assertions as admitted by the Plaintiffs, because "where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal alterations omitted) (collecting cases); *see also Fiedler v. Incandela*, No. 14CV2572SJFAYS, 2016 WL 7406442, at *6 (E.D.N.Y. Dec. 6, 2016) ("The court need not consider as true any fact that is not supported by admissible evidence." (citing *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 260 (S.D.N.Y. 2014))); *Suares v. Cityscape Tours, Inc.*, No. 11 CIV. 5650 AJN, 2014 WL 969661, at *2 (S.D.N.Y. Mar. 12, 2014), *aff'd,* 603 F. App'x 16 (2d Cir. 2015) (where the Plaintiff failed to provide any citations to the record, the Court deemed "[e]ach numbered paragraph in the statement of material facts set forth in [the] defendants 56.1 statement admitted for purposes of the motion") (citing Local Rule 56.1) (original alterations omitted); *Hoefer v. Bd. of Educ. of Enlarged City Sch. Dist. of Middletown*, No. 10 CIV. 3244 ER, 2013 WL 126238, at *1 n.3 (S.D.N.Y. Jan. 9, 2013) (deeming all of the Defendants' assertions supported by evidence admitted where the Plaintiff failed to cite to admissible evidence); *Costello v. N.Y. State Nurses Ass'n,* 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to a defendant's Rule 56.1 statement where the plaintiff failed to refer to evidence in the record); *F.T.C. v. Med. Billers Network, Inc.,* 543 F. Supp. 2d 283,

302 (S.D.N.Y. 2008) (disregarding assertions "not accompanied by citation to admissible evidence"); *Arline v. Potter*, 404 F. Supp. 2d 521, 527 (S.D.N.Y. 2005) (deeming all of the defendant's assertions in its 56.1 statement admitted by the Plaintiff for failure to rely on admissible evidence).

Accordingly, the following facts are drawn from the Defendants' 56.1 Statement and are deemed admitted where the Defendants' assertions are supported by evidence. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 421 (S.D.N.Y. 2014) ("the Court has only relied upon uncontroverted paragraphs of Defendants' Rule 56.1 Statement where the record evidence duly supports Defendants' contentions."); *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 508 (S.D.N.Y. 2014) (stating that the Court was "mindful that [t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." (internal citations and quotation marks omitted)); *Berdugo v. City of New York,* No. 03 Civ. 7319, 2004 WL 1900357, at *1 (S.D.N.Y. Aug. 23, 2004) (where plaintiff failed to follow requirements of Local Rule 56.1, deeming defendants' statements of facts admitted, but only to the extent that they were supported by the record).

### 2. The Relevant Facts

Accordingly, the following relevant facts are drawn from the Defendants' 56.1 Statement. For the reasons stated above, any statements made in the Defendants' 56.1 Statement that were supported by the cited evidence are deemed admitted by the Plaintiffs.

NYCB is a savings bank chartered in New York State. NYCB has more than 250 bank branch locations, through which it conducts its retail business, and serves customers throughout the greater New York City metropolitan area, New Jersey, Florida, Ohio and Arizona. (Declaration

of Cynthia Flynn ["Flynn Dec."] at ¶ 2). When NYCB reduced its workforce on October 13, 2011, retail branch employees were divided into four classifications: Branch Manager ("BM"); Assistant Branch Manager ("ABM"); Branch Management Associate ("BMA") and Financial Services Associate ("FSA"). (*Id.* at ¶ 3).

NYCB utilized a "float pool" to cover certain geographic areas. That is, NYCB grouped branches by location, and placed certain employees in "float pools" to cover branch employees within that area if they were sick, on a leave of absence, or on vacation. (*Id.* at ¶ 4). The responsibilities of the employees in the float pool would vary depending on which employee they had to cover. (*Id.*). Before the RIF, each "float pool" had as many as 86 employees. (Flynn Dec. 15). None of the float pool employees occupied management positions. (*Id.*). The only employees in the float pool were FSAs. (*Id.* at ¶ 50).

NYCB has written policies and procedures regarding Affirmative Action and Equal Employment Opportunity. (Mashburn Dec. at ¶¶ 2-4; Exhibits A, B).

On October 13, 2011, NYCB reduced its workforce in its New York branches because fewer consumers use retail bank locations. (Flynn Dec. at ¶ 6–7). NYCB undertook an assessment of staffing levels using data from each branch location and studying their competitors' best practices. (*Id.* at ¶ 9).

NYCB collected data from each branch. It analyzed each branch's transactions during the previous six months; the number of new accounts opened; whether individual tellers were meeting supposed industry benchmarks; and the customer base and local market of each branch. (*Id.*. at ¶ 9). Utilization of accepted industry benchmarks to determine modeling/Full Time Equivalent ("FTE") allotment as follows: 2000 transactions/month per 'teller' FTE; and 40 new accounts per "platform" FTE. NYCB also retained a consultant to observe its competitors. (*Id.* at ¶ 10). The

consultant observed staffing and customer traffic at twenty-one other banks of varying sizes in four states.  (*Id.* at ¶ 10).

As a result of its analysis, NYCB believed that it was overstaffing its branch locations. According to its analysis, competitors were staffing 4.34 FTE in branches with less than $30 million in deposits and NYCB was staffing 4.67 FTE.  Competitors' branches that held between $30 million and $100 million were staffing 4.75 FTE while NYCB was staffing 6.13 FTE.  At the largest branches, which held over $100 million in deposits, competitors were staffing 5.74 FTE while NYCB staffed 9.14 FTE.  (Flynn Dec. at ¶ 11).

NYCB's strategy for reducing its workforce relied on creating clusters, seemingly very similar to the float pools that it already utilized.  (*Id.* at ¶ 13).  Branch locations that were close in proximity were placed in the same cluster, and employees would be required to commute to other branches within the cluster.  (*Id.* at ¶ 14).  Furthermore, NYCB compared employees' performance with other employees in their cluster, rather than merely with other employees in the same branch. (*Id.* at ¶ 14).  The categories of employees required to float was expanded to include all job titles at the branch level.  (Mashburn Dec. at ¶ 50).  Some employees, including management-level employees, became cluster floaters.  (Flynn Dec. at ¶ 15).  NYCB believed that the advantages of clustering would be similar to those of the "float pool," in that absences would be easily covered. (*Id.* at ¶ 17).  Furthermore, NYCB claims that it provided an opportunity for the bank to evaluate talent more efficiently.  (*Id.* at ¶ 18).

To determine who would be terminated or transferred, NYCB developed a "performance score" using employees' recent disciplinary history, scores received in recent performance evaluations, branch audits, and special skill sets such as securities licenses or fluency in another language.  (*Id.* at ¶ 21; Mashburn Tr. at 11–19).  Employees' scores were compared to other

employees who had the same employment status and position. (Flynn Dec. at ¶ 23). In order to qualify for a transfer, an FSA had to have a performance score of at least 60, and ABMs and BMs had to score at least 70. (Smith Dec. at ¶ 8 Ex. G (Mashburn Tr. at 40-41)). NYBC terminated employees with the lowest scores and kept those with the highest scores. (Flynn Dec. at ¶ 24).

Before the October 2011 RIF, NYCB employed 1,766 individuals in New York and New Jersey. (*Id.* at ¶ 26). 332 of those employees were male (18.8%), and 1,434 were female (81%). (*Id.* at ¶ 27). From the 1,766 employees in the New York and New Jersey branches, NYCB terminated 320 employees. (*Id.* at ¶ 26). Of those 320, 42 were male (13%), and 278 were female (87%). (*Id.* at ¶ 27).

Regional Retail Executives and Regional Retail Managers did not know about the RIF until October 10, 2013—which was three days before it went into effect. (Flynn Dec. at ¶ 28).

Each of the Plaintiffs were employed at a branch location where less than one-third of the employees were terminated. (Mashburn Dec. at ¶ 54; Mashburn Ex. E).

### a. Maria Alexander

Maria Alexander ("Alexander") was hired by NYCB in July 1999. (Harrold Ex. B, Dep. of Alexander ("Alexander Tr.") at 8). Alexander worked in various customer service roles during her tenure with NYCB in Bayonne, New Jersey. (Harrold Ex. B, Dep. of Alexander ("Alexander Tr.") at 6, 9–10, 67)). Before she was terminated, she was an FSA, where her duties included opening accounts for new customers, cross-selling to customers, closing accounts and disbursing money. (Harrold Dec. at ¶ 3 Ex. B (Alexander Tr. at 10-11)).

On February 3, 2009, Alexander received an employee disciplinary warning notice. She had failed to include the customer's zip code on a signature card and the date was incorrect. The notice was signed and issued by Rose Bates, and signed by Fahima Hamid and Susan Fernandez.

Alexander testified in her deposition that she did make those mistakes, but minimized their severity. (*Id.* at 14–15).

On April 23, 2009, Alexander received a disciplinary warning for using the wrong account number when opening an account. Alexander admitted in her deposition that she had made the mistake, and that it was a problem. (*Id.* at 19–20). She added that "there w[ere] a lot of things like that going on." (*Id.* at 19–20). Amira Barsum, the supervisor manager, and Rose Bates, the branch manager, issued the warning. (*Id.* at 19–20).

On March 4, 2010, Alexander received another disciplinary warning, for unprofessional and improper conduct. (Alexander Tr. at 26). Specifically, Alexander lost her temper and yelled at her supervisor manager Amira Barsum. (*Id.* at 27–28). Alexander further stated that she did not get along with Barsum. (*Id.* at 25).

In April 2010, Alexander was transferred from NYCB's 46th Street branch to NYCB's 26th Street branch. (Harrold Dec. at ¶ 3; Alexander Tr. 29–30, 33). Alexander did not object to the transfer because she believed that she was being treated unfairly by Barsum. (Alexander Tr. at 30). She received a performance evaluation two months later on July 8, 2010, where she was given a rating of 3.35 out of 5. (Harrold Ex. C at NYCB040874). This score indicated that she was meeting the requirements of the job. (Harrold Dec. at ¶ 3). Diana Lewis was one of the supervisors who evaluated Alexander. Before Lewis' evaluation, Alexander had "fairly positive feelings" about Lewis. But after Lewis started supervising her, Alexander started having problems with Lewis. (Alexander Tr. at 31–32, 35).

On April 21, 2011, Alexander received a lateral performance evaluation in which she was given a score of 2.85 out of 3. (Harrold Ex. C at NYCB040872). This score indicated that she was meeting the requirements of the position.

On July 12, 2011, Alexander received a rating of 2.85 out of 5 on her annual performance evaluation. (Harrold Ex. C at NYCB040876). This score indicated that she was meeting the requirements of the position.

In July 2011, Lewis accused Alexander of forging her signature on a customer's debit card application. (Alexander Tr. at 46). Alexander said that she was first told that she would not be fired by someone in human resources, and that she would be transferred to whatever branch she wanted. (*Id.* at 51). Around the same time, she was told by Aubrey Zuckerman, a manager at the 26th Street branch, that she was terminated. (*Id.* at 55). Alexander testified in her deposition that she was fired because of forgery. (*Id.* at 63).

When Alexander applied for unemployment benefits, NYCB told her to return to work, and she did. (*Id.* at 62–64). The discipline that she had received from Lewis was rescinded. (*Id.* at 64). She did not receive any other discipline. (*Id.*).

Alexander did not believe that Zuckerman discriminated against her based on her gender, but believes that Lewis did. (*Id.* at 36, 40–41). Alexander's basis for this belief is that Lewis asked male employees to help Alexander with her work. (*Id.* at 40–41). Alexander further testified in her deposition that she does not have any facts to support the proposition that Robert Wann, Cynthia Flynn, John Fennell or Joseph Ficalora discriminated against women. (*Id.* at 109).

Alexander believed that Rose Bates, Fay Hamid, and Susan Fernandez discriminated against her based on her gender. (Alexander Tr. at 15–18). She based that belief on the fact that she was not promoted during her tenure at NYCB while men were promoted and made more money than her. (*Id.* at 15–18). Specifically, she stated that she thought Partiv Dalal ("Dalal") started at a higher salary and that Timothy Gosnell ("Gosnell") was promoted over her. (*Id.* at 71). Dalal was hired as a teller in 2008 and resigned in July 2011. When he resigned, his salary was $25,150.

(Stratico Ex. V).  Gosnell was hired as a personal banking representative in 2004, promoted to Assistant Head Teller in 2005, and promoted to Branch Management Associate in 2009.  In October 2011, Gosnell's salary was $34,200, which was lower than Alexander's salary of $37,100. (Stratico Ex. X).

Alexander learned of the reduction in force at a meeting at the 6th Street branch.  (Alexander Tr. at 65).  She, along with the other employees present at the meeting, were told that they were all terminated.  (*Id.* at 65).  She does not know who made the decisions about which employees would be terminated.  (Alexander Tr. at 105).

Before she was terminated, Alexander was one of 18 full-time FSAs in the Bayonne Cluster.  (Masburn Dec. at ¶ 4).  Alexander's annual salary was $37,100, which was more than the 17 other full-time FSAs in her cluster.  (*Id.* at ¶ 5).  Her Performance Score of 30.50 was the lowest of those 18 employees.  (*Id.*).  Six of those 18 were laid off.  Of the remaining 12, the lowest performance score was 64.  The two males who were retained had performance scores of 83.5 and 100.  (*Id.*).

The Bayonne Cluster was part of Region 6.  Region 6 had 47 full time FSAs—41 females and 6 males.  Alexander's salary was the highest among the 47 full-time FSAs in Region 6.  (*Id.* at ¶ 6).  The highest-paid male made $28,900.  (*Id.*).

### b.  Donna Berchiolli

Donna Berchiolli ("Berchiolli") was hired by Roosevelt Savings Bank as a part-time teller in 1992.  She became a full-time associate and was promoted ultimately to branch manager associate.  (Harrold Ex. D, Berchiolli Sept. 14, 2015 Dep. ("Berchiolli Tr.") at 14–15).  Roosevelt Savings Bank was ultimately acquired by NYCB.  (*Id.* at 15–16).  When Roosevelt Savings Bank

was acquired, Berchiolli was a supervisor. (*Id.* at 16). Berchiolli worked at the Howard Beach branch and annex during her tenure with NYCB. (*Id.* at 17).

On March 12, 2009, Berchiolli received a disciplinary warning for failing to follow NYCB procedure regarding "teller differences." (*Id.* at 41). Berchiolli admitted in her deposition that there were teller differences. (*Id.*). The Court notes that teller differences appears to refer to when a teller's register has more or less money than the teller's accounting indicates it should. (Harrold Ex. E at NYCB041164). The warning says that there were five incidents of teller differences, and that the total of differences was $379.30. (*Id.* at NYCB041163).

On March 31, 2009, she received a 3.35 out of 5 on her annual performance evaluation. (Harrold Ex. E at NYCB041214). The score indicated that she met the requirements of the position. The evaluation was prepared by Camille Ruggiero Lyons ("Lyons") and Donna Cappello ("Cappello"). (*Id.*). Berchiolli testified that she did not believe that she received this score because she was female. (Berchiolli Dep. at 25).

On April 9, 2010, Berchiolli received a 3.5 out of 5 on her annual performance evaluation, again indicating that she was meeting requirements. (Harrold Ex. E at NYCB041212). Lyons and Cappello prepared that evaluation. (*Id.*). Berchiolli testified that she did not believe that her gender affected her score. (Berchiolli Tr. at 33).

On November 22, 2010, Berchiolli received another disciplinary warning for failing to follow NYCB procedure regarding "teller differences." (Harrold Ex. E at NYCB041159–60). The warning notes that there were seven total incidents during the "rolling period" and that the total of differences was $129.91. (*Id.* at NYCB041160). The warning was prepared by Cappello and Lyons. (*Id.*). Berchiolli did not believe that they gave her the warning because of her gender. (Berchiolli Tr. at 38).

On April 14, 2011, Berchiolli received 3.25 out of 5 on her annual performance evaluation. (Harrold Ex. E at NYCB041209). The evaluation was prepared by Cappello and Lyons. (*Id.*). Berchiolli did not believe that her gender affected her score. (Berchiolli Tr. at 43).

Berchiolli testified that she does not know if Robert Wann or John Fennell were involved in the issuance of her disciplinary warnings, and said that she had no reason to believe that Sal Spano or Jo-Anne Camacho were involved in their issuance. (Berchiolli Tr. at 39–41). She further testified that she had no reason to believe that any of those individual had any input in her annual performance evaluations. (*Id.* at 45–46).

Berchiolli does not know who Cynthia Flynn and Shannon Mashburn are. (*(Id.* at 40). She did not have any direct contact with her Regional Retail Executive, John Careddu, or his assistants; nor did she have much contact with NYCB Human Resources. (*Id.* at 47–48).

On October 13, 2011, Berchiolli attended a meeting at the Lindenwood branch along with 40 other employees. (*Id.* at 55–56). All of the employees were informed that they were terminated. (*Id.*). She does not know who decided which employees would be terminated or what factors were used in making the determination. (*Id.* at 58). Berchiolli did not know to whom she was compared when NYCB decided to terminate her, but she believed that she was possibly compared to David Dim ("Dim"). (*Id.* at 58–60).

Before she was terminated, there were nine BMAs in Berchiolli's cluster. There were eight females and one male, which was Dim. (Mashburn Dec. at ¶ 7). Dim had the highest Performance Score, 101.75, among BMAs in the cluster. (*Id.*). Berchiolli's score was 58.25, which was the second lowest among BMAs in the cluster. (*Id.*). Three females BMAs besides Berchiolli were terminated, and two of them had higher performance scores. (*Id.*).

There were 37 total BMAs in Berchiolli's region—30 females and 7 males. (*Id.* at ¶ 8). Berchiolli's salary was in the middle of the group—she had the 18th highest salary. (*Id.*). Two males had higher salaries and five males had lower salaries. (*Id.*).

Berchiolli testified that she believed that she was terminated based on her gender because Said Salah, a male, received disciplinary warnings but was not terminated; and the management team "was all let go." (Berchioli Tr. at 60). However, Berchiolli admitted that Salah was transferred out of the Howard Beach branch before the RIF; that she had no personal knowledge about any warning Salah had received—only that she had heard that he received one for theft; and that David Dim and Jennifer LaScala remained on the management team after the RIF. (*Id.* at 60–61, 71).

### c. Shannon Byrnes

Shannon Byrnes ("Byrnes") worked for NYCB from September of 2002 until October 2011. (Harrold Ex. F, September 14, 2015 Dep. of Shannon Byrnes ("Byrnes Tr.") at 10). Specifically, she started as a part-time teller at the Clock Tower branch. She was promoted to several more senior positions, and was a BMA at the time of her termination. (*Id.*). In March 2010, she was transferred to the Howard Beach branch. (*Id.* at 31).

On December 15, 2009, Byrnes received a 4 out of 5 on her annual performance evaluation, indicating that she was exceeding requirements. (Harrold Ex. G at NYCB041841). Byrnes testified that she believed that she deserved "far exceeds" requirements, but that she was told that the regional manager instructed managers not to give "5s." (Byrnes Tr. at 22). Byrnes believed that her score could have been affected by her gender, and that "everybody that [she] had spoken with . . . were all women who" also felt that they deserved higher scores. (*Id.* at 27).

On April 5, 2010, Byrnes received an employee disciplinary warning notice for teller differences. (Harrold Ex. G at NYCB041758). There were seven total incidents during the "rolling period," and the total of differences was $1,115.89. (Harrold Ex. G at NYCB041759). Most of that money was lost during a transaction where Byrnes believed that she gave a customer $1000 more than he deserved. (Byrnes Tr. at 29). Byrnes testified that she believed that the warning was factually accurate, and that she did not contest the disciplinary warning. (*Id.* at 28–29). The branch manager, Stefan Malliet, issued the warning. (*Id.* at 29). Byrnes did not believe that he issued the warning to her because she is a woman. (*Id.*).

On January 13, 2011, Byrnes received a 3.7 out of 5 on her annual performance evaluation, indicating that she was nearly exceeding requirements. (Harrold Ex. G at NYCB041831). The review was issued and signed by Lyons and Cappello. (*Id.*). Byrnes believed that she deserved higher ratings, but she admitted that she did experience a learning curve when she transferred from the Clock Tower branch to the Howard Beach branch because the latter was much busier. (Byrnes Tr. at 42–43).

On May 9, 2011, Lyons and Regional Manager Marilyn Ramnarine ("Ramnarine") completed a Corporate Advocacy performance evaluation in which they gave Byrnes a 25.1 out of 30. (Harrold Ex. G at NYCB041872).

Byrnes did not have significant contact with Ramnarine or John Careddu, who were members of the Regional Management Team, and has no information that leads her to believe that they were the ones who decided to terminate her. (Byrnes Tr. at 52, 82). The only person with whom she spoke in Human Resources was Dan Cappiello, who handled benefits. (*Id.* at 53–54).

Byrnes testified that she does not have any reason to believe that Robert Wann, John Fennell, Salvatore Spano or Shannon Mashburn had any input into her three performance

evaluations in 2010 and 2011 or her disciplinary warning; and that she does not know Cynthia Flynn or Jo-Anne Camacho and has no reason to believe that they had any input on any of those documents. (*Id.* at 65–67).

Byrnes said that she did not believe that Shannon Mashburn harbored any animosity towards her because of her gender; and she did not have any personal knowledge that gave her reason to believe that Robert Wann or John Fennell discriminated against employees based on gender. (*Id.* at 76, 78). She testified that she heard about a "911 call where they were told that they were overreacting females," and that lead her to believe that Wann discriminated against employees based on gender. (*Id.*).

On October 13, 2011, Byrnes attended a meeting at the Lindenwood branch where she and approximately 40 other employees were told that they were terminated. (*Id.* at 67–69). She testified that she does not know what factors were used to determine how to reduce the workforce other than NYCB's response to her EEOC complaint; or with whom she was compared in determining that she would be terminated. (*Id.* at 72–75). Byrnes admitted that she did not hold any licenses at the time of her termination and never indicated to NYCB that she spoke any languages besides English. (*Id.* at 80).

Before her termination, Byrnes was one of 9 BMAs in her cluster. (Mashburn Dec. at ¶ 9). There were 8 females and one male, Dim. (*Id.*). Dim had the highest performance score of the BMAs in the cluster. (*Id.*). Byrnes' score of 75 was the fourth lowest of the 9 BMAs. Four female BMAs, including Byrnes, were terminated. (*Id.*). Byrnes was one of 37 BMAs in her region. There were 30 females and 7 males. Byrnes' salary was the 9th highest of BMAs in her region, and exceeded the salaries of all of the males in her region. (Mashburn Dec. at ¶ 10).

Byrnes testified that she thought that Said Salah ("Salah") should have been terminated instead of her because "[h]e had so many problems with numerous branches . . . [,] had a warning [] for basically falsifying documents . . . [,] [and] has . . . lower ratings." (Byrnes Tr. at 79). Byrnes admitted that she never worked with Salah and had no personal knowledge about him. (*Id.* at 74–75).

In September 2008, and February 2009, Salah received a rating of "exceeding expectations" from Lyons and Cappello. (Harrold Ex. H, Sept. 9, 2015 Dep. of Donna Cappello ("Cappello Tr.") at 197, 200–01). The Court notes that although NYCB claims that Salah received 24.7 out of 30 and 4 out of 5 on those respective evaluations, the evidence to which NYCB cites does not support those propositions. The Court could not find Salah's evaluations or testimony regarding his scores.

Byrnes and Salah were both promoted to Assistant Branch Supervisor in January 2007. During the period in which they both held that position, Byrnes made more money than Salah. (Stratico Ex. D; Stratico Ex. DD). Byrnes and Salah both received corporate title promotions on July 1, 2008 when they became management trainees. In February 2009, they were both promoted to BMA. During the period in which they both held that title, Byrnes made more money than Salah. (Stratico Ex. D; Stratico Ex. DD). When Salah was promoted to a position higher than Byrnes' position, his salary was still less than hers. In October 2011, Salah's salary was $39,850, which was less than Byrnes' salary of $40,300. (Stratico Ex. D; Stratico Ex. DD).

Byrnes believed that she was paid less than two males—Dim and Mohammed Amin ("Amin"). (Byrnes Tr. at 54–55). She believed this based on "talk" within the branch. (*Id.* at 54–56).

When she was terminated, Byrnes' salary was $40,300. (Stratico Ex. D). At the same time, Dim's salary was $39,750. (Stratico Ex. W). During the periods when Byrnes and Dim held the same position, Byrnes' salary was higher than Dim's. (Stratico Ex. D; Stratico Ex. W).

In 2008, Byrnes' salary increased from $32,600 to $33,800; and Amin's salary increased from $29,000 to $33,000. (Stratico Ex. D; Stratico Ex. S). In 2009, Byrnes' salary was $35,500; and Amin's salary was $34,200. (*Id.*) During those years, Byrnes and Amin occupied the same position. (*Id.*) In October 2011, Byrnes, who was a BMA, had an annual salary of $40,300; and Amin, who had been an ABM for 21 months, had an annual salary of $41,900. (*Id.*)

Byrnes also felt that she was passed over for a promotion at the Clock Tower branch. Specifically, there was an ABM opening at some point in 2009. (Byrnes Tr. at 34–36). She told the branch manager that she was interested. (*Id.*) She does not know who else applied, but Amin was given the position in February 2009. (*Id.*) Byrnes does not know why he was chosen or who chose him. (*Id.*) She did not complain about the selection to anyone. (*Id.*)

### d. Donna Cappello

Donna Cappello ("Cappello") began working for the Roosevelt Savings Bank as a part-time teller at its Howard Beach branch in June 1977. (Harrold Ex. H, Sept. 9, 2015 Dep. of Donna Cappello ("Cappello Tr.") at 10–11). Roosevelt Savings Bank merged with Roslyn Savings Bank in 1999, and NYCB acquired Roslyn Savings Bank in 2003. (Cappello Tr. at 11). Cappello held various positions during her tenure with the banks, and she became an ABM in early 2005. (*Id.* at 9–10). Throughout her employment with NYCB and its corporate predecessors, Cappello worked at the Howard Beach branch. (*Id.* at 11–12).

On May 18, 2009, Cappello received a 27.7 out of 30 on her annual corporate performance evaluation. (Harrold Ex. I (documents in exhibit do not have Bates numbers). The evaluation was prepared and signed by Lyons and Careddu. (*Id.*).

In late fall of 2009, Careddu told Cappello that "ratings cannot be as high as they were in the past. No one should be receiving [] the top rating . . . ." (Cappello Tr. at 170).

On April 7, 2010, Cappello was issued a disciplinary warning for negligence in relation to an employee's theft of $8,000. (Harrold Ex. I). Cappello believed that the warning was unjust because she had no personal responsibility. (Cappello Tr. at 129, 133–34). Nevertheless, Cappello admitted that she realized that management has a responsibility to tend to the branch. (*Id.* at 134). Other members of the Howard Beach branch management team also received disciplinary warnings, including Lyons, ABM Enille D'Amato ("D'Amato"), Salah, and BMA Addolorata Quiles ("Quiles"). (*Id.* at 129, 131–33). Cappello testified in her deposition that she believed that D'Amato, Salah, and Quiles were more culpable than the other members of management who received warnings because they had signed off on the cash counts and the monthly audits during the period of time in which the money was stolen. (*Id.* at 132–33). She agreed that the theft of money was a negative event for NYCB. (*Id.* at 147–48).

At some point in time, Cappello called 911. The date of the call and the reasons for the call are unclear because those portions of Cappello's transcript were not provided. Nevertheless, Cappello stated that she had reasonable cause to make the 911 call and that people "above" her in the organization agreed with the call; but that the "folks" did not commit a crime, threatened a lawsuit and asked for a lot of money. (*Id.* at 147). Cappello testified that this was also a negative event. (*Id.*).

On April 12, 2010, Lyons told Cappello that they were being transferred out of the Howard Beach branch. (*Id.* at 158). Two or three days later, Lyons told Cappello that all members of the Howard Beach branch management team were being transferred. (*Id.* at 160). Later that week, Cappello learned that the entire Howard Beach branch was being transferred instead. (*Id.* at 161). That Friday, Lyons was told to wait to complete the transfers until Monday. (*Id.* at 162). Then on Monday, April 19, 2010, Lyons and Cappello received a phone call informing them that all of the transfers were cancelled. (*Id.*).

On June 28, 2010, Cappello received 25.05 out of 30 on her annual corporate evaluation form, indicating that she was exceeding expectations. (Harrold Ex. I). Lyons and Ramnarine prepared and signed the form. (*Id.*).

In May 2011, Lyons nominated Cappello to be elevated from assistant vice president to second vice president. (Cappello Tr. at 59; Harrold Ex. I). Cappello did not receive the corporate promotion. (Cappello Tr. at 60). She believed that in order to become a second vice president, one had to first be a branch manager. (*Id.*).

On May 11, 2011, Cappello received a 25.5 out of 30 on her annual corporate performance evaluation, indicating that she was exceeding expectations. (Harrold Ex. I). The evaluation was prepared and signed by Lyons and Ramnarine. (*Id.*).

Cappello testified that she believed that her 2010 and 2011 evaluations were not fairly representative of her work because they were downgraded based on the corporate directive to do so. (Cappello Tr. at 183–84). She said that she did not know if anyone besides Lyons, Careddu or Ramnarine was involved in assigning her performance evaluation scores. (*Id.* at 184–85).

Cappello testified that she does not know Cynthia Flynn, Shannon Mashburn or Zhongcai Zhang; and does not personally know Jo-Anne Camacho. (Cappello Tr. at 23–24; 242–43).

Cappello did not feel that there was any friction or ill will between her and Human Resources; and did not feel that Alexandra O'Brien or Irene Eger treated her differently based on her gender.. (*Id.* at 27–28). She had a good relationship with the regional management team of Careddu, Ramnarine and Andrea Gonzalez during her last few years at NYCB, and did not feel that they treated her differently because of her gender. (*Id.* at 28).

However, Cappello believed that Wann did discriminate against women. (*Id.* at 95). She testified that she "had heard that from employees who had [] heard him say that." (*Id.*). She also had heard that after the meeting with security regarding the 911 call, Wann said "to get rid of all [of] the female management staff that were at the branch," (*Id.* at 97); and Careddu had told her that Wann had ordered the Howard Beach transfers. (*Id.*).

On October 13, 2011, Cappello attended a meeting at the Lindenwood branch where she and approximately 40 other employees were informed that they were terminated. (Cappello Tr. at 205–06, 212).

Before she was terminated, Capello was one of 11 ABMs in her cluster. (Masburn Dec. at ¶ 11). The cluster was made up of 8 females and 3 males. (*Id.*). Cappello's Performance Score of 78.93 was the lowest of the ABMs in her cluster. The four highest Performance Scores belonged to female ABMs in the cluster. 3 females, including Cappello, were terminated. No males were terminated. (*Id.*).

Cappello's salary of $63,220 was the second highest among the 49 ABMs in her region. (*Id.* at ¶ 12). Her salary ranked 7th among 256 ABMs in New York and New Jersey. (Id at ¶ 13). Only one male ABM in those two states had a higher salary than Cappello. (*Id.*). Her salary as an ABM was higher than the salaries of 117 of the 192 branch managers in those two states. (*Id.* at ¶ 14).

### e. Mary Ellen Cassidy

Mary Ellen Cassidy ("Cassidy") was hired by Columbia Federal Savings Bank in 1994 as an assistant manager at its Woodhaven branch. (Harrold Ex. J, Nov. 20, 2015 Dep. of Cassidy ("Cassidy Tr.") at 8). She joined NYCB when it acquired Columbia Federal Savings Bank. (*Id.*). Cassidy became Branch Manager of the NYCB Woodside branch in October 2006, and was transferred to the same position at the Forest Hills branch in November 2008. (Stratico Ex. F). Cassidy worked as a branch manager for the remainder of her tenure with NYCB. (*Id.*).

On October 16, 2008, Cassidy received an employee disciplinary warning for unsatisfactory performance. (Harrold Ex. K, NYCB042198). The warning stated that several members of the Woodside branch had complained about the manner in which Cassidy supervised them and the branch. (*Id.*). Cassidy disagreed with the warning and signed it under protest. (*Id.* at NYCB042200). Cassidy testified in her deposition that although she did not believe that the complaints reflected poorly on her leadership or management skills, she acknowledged that her superiors felt that it did. (Cassidy Tr. at 45). Because of the warning, Cassidy was transferred from the Woodside branch to the Forest Hills branch. (*Id.* at 46).

Cassidy replaced Heather Palmer ("Palmer") as the BM at the Forest Hills branch. (*Id.* at 117). Cassidy testified that she believed that Palmer did not take responsibility for the problems at that branch; failed to issue warnings to the employees there; did not deal with performance issues; and that Cassidy unfairly inherited those problems. (*Id.* at 117–18).

On her 2009, 2010, and 2011 annual corporate performance evaluations, Cassidy respectively received 24, 23.2 and 23.9 out of 30. (Harrold Ex. K, NYCB042238–43). Each of those scores indicated that she met expectations. Each evaluation was prepared by Ramnarine and signed by Careddu. (*Id.* at NYCB042238–43).

Cassidy did not receive any negative evaluations or any disciplinary warnings after her October 16, 2008 warning. (Cassidy Tr. at 57). She believed that managers were being given scores indicating that they were merely "meeting expectations" because people received raises if they had higher scores. (*Id.* at 59). She further states that she thought that the bank gave preferential treatment to homosexuals; and to employees who had always been with NYCB, as opposed to those who came from banks that NYCB acquired. (*Id.* at 123–24).

In October 2011, all of the employees at the Forest Hills branch were women. (Cassidy Tr. at 94).

Cassidy testified that she does not know who made the termination decisions, but that it had to be Wann and the "money people up high." (*Id.* at 97).

Cassidy does not know Flynn or Mashburn; and has no reason to believe that John Fennell, Salvatore Spano or Camacho discriminated against employees because of their gender. (*Id.* at 100–101, 133–34). She "used to run across" Wann a lot at the NYCB corporate headquarters, and she felt that he was "curt with women," and part of the "old boys network." (*Id.* at 100). She further testified that Dorothy Rios had attributed a derogatory comment about women to Wann, but that Cassidy did not have any personal knowledge of the statement, and she had no evidence that he discriminated against women. (*Id.* at 110). Other than the fact that many people that she knew who were terminated were women, she had no evidence that members of management discriminated against women. (*Id.* at 110–13).

Cassidy was terminated in October 2011 during the RIF. (*Id.* at 95–96). Before her termination, she was one of 17 BMs in her cluster which was comprised of 11 females and 6 males. (Mashburn Dec. at ¶ 15). Cassidy and another female BM had the lowest Performance Score of

the BMs in the cluster, which was 58.50. Four female BMs, including Cassidy, and one male BM were terminated. The lone male who was terminated had a Performance Score of 83.50. (*Id.*).

Cassidy was one of 36 BMs in her region, which consisted of 23 females and 13 males. (*Id.* at ¶16). Her salary ranked 16th in the group: lower than eight females and seven males; and higher than three females and one male. (*Id.*).

### f. Theresa Falco

Theresa Falco ("Falco") was hired as a part-time vault teller by Roosevelt Savings Bank in April 1997. (Harrold Ex. L, Sept. 21, 2015 Dep. of Falco ("Falco Tr.") at 19). When NYCB eventually acquired Roosevelt Savings Bank's corporate successor, Falco was a full-time teller. (*Id.* at 24). At the time of her termination in October 2011, she was an FSA. (Stratico Ex. G). During her tenure with NYCB, Falco worked at the Howard Beach branch. (Falco Tr. at 21).

On her 2009, 2010, and 2011 annual performance reviews, Falco respectively received 3.5, 3.15, and 3.00; each score indicated that she was meeting requirements. (Harrold Ex. M). Each evaluation was issued and signed by Lyons and Cappello, except for the 2011 evaluation which was signed by Lyons and LaScala. (*Id.*). Falco testified that she believed that she received low scores both because of her gender, and because her managers told her that everyone had to receive lower scores. (Falco Tr. at 35–36, 45–46, 58). Falco was unable to identify any male tellers who received higher performance evaluations in 2009 at her branch. (*Id.* at 35–36).

Falco received three disciplinary warnings in 2010 and 2011. (Harrold Ex. M). Each of the three warnings were for failure to follow NYCB procedure regarding teller differences. (*Id.*). Falco did not dispute the factual accuracy of the warnings. (Falco Tr. at 52–56, 61–62).

Falco testified that she does not know Flynn, Spano, Mashburn or Camacho; that she did not know who her regional managers were during her last three years at NYCB; and that she did

not have any personal contact with Human Resources personnel during those years. (*Id.* at 68, 73–74).

Before her termination, Falco was one of 41 full-time FSAs in her cluster, which was comprised of 38 females and 3 males. (Mashburn Dec. at ¶ 17). Falco's salary was higher than the 3 males in the cluster. Her Performance Score of 41.25 was the second lowest among the full-time FSAs in the cluster. 8 full-time FSAs were laid off, and the 3 male full-time FSAs who were retained had Performance Scores of 89.0, 71.25, and 58.5. (*Id.*).

### g. Nansi Ghobrial

Nansi Ghobrial ("Ghobrial") was hired by NYCB as a universal personal banking representative in July 2005 to work at its 26th Street branch in Bayonne, New Jersey. (Harrold Ex. N, Sept. 15, 2015 Dep. of Ghobrial ("Ghobrial Tr.") at 25, 28). She was promoted to ABM at the 46th Street branch in Bayonne in December 2009, and held the position of AMB for the remainder of her tenure with NYCB. (*Id.* at 29, 33).

On her three performance evaluations in 2010 and 2011, Ghobrial respectively received 3.45, 2.85 and 3.30 out of 5. Each score indicated that she met requirements. (Harrold Ex. O). She testified that she believed that she deserved higher ratings, but that she had been told by her regional managers that they could not give ratings of five, and that they could only give a couple of fours. (Ghobrial Tr. at 39–40). She further testified that she believed that her first score of 3.45 was based on her gender. (*Id.* at 41). She said that Vincent Oyola ("Oyola"), a male manager told her that male managers got the scores that they deserved. (*Id.* at 40). Ghobrial admitted that she did not know what Oyola's score was, but she was "pretty sure it was more because he did tell me that he . . . [got] the rating that they deserved." (*Id.* at 41). She further stated that she did not have

any information about the performance ratings of other male ABMs in her region other than what Oyola said. (*Id.* at 52).

Ghobrial received two disciplinary warnings between 2010 and 2011. She received one on November 5, 2010, for failing to follow bank procedures in properly processing an OTC check resulting in the branch being out of proof. (Harrold Ex. O). Ghobrial testified that the error was due to a glitch in the system during a conversion that other branches also experienced. (Ghobrial Tr. at 66–67). She did not know whether other employees received similar warnings for the glitches. On May 23, 2011, she also received a disciplinary warning for failing to follow bank procedures and releasing a check for approximately $27,000 on which Risk Management had placed an extended hold. (Harrold Ex. O). Ghobrial testified that she did not think it was her fault because the BM, Jennifer Scotto, was the person who released the check using Ghobrial's computer. (Ghobrial Tr. at 73–75). Ghobrial did not believe that she received the warning because of her gender. (*Id.* at 78–79).

Ghobrial does not know whether Wann, Fennell or Spano played any role in her disciplinary warnings or her evaluations. She assumed that either Wann or Fennell told regional managers that they had to give employees a certain amount of evaluation numbers. (*Id.* at 80–82). Ghobrial does not know Mashburn, Camacho, or Flynn. (*Id.* at 82–83, 117).

Ghobrial testified that she does not know who was involved in making the termination decisions; nor does she know what factors were used to determine who would be terminated; nor does she know to whom she was compared. (*Id.* at 112–13).

No one made any negative comments to Ghobrial about her gender while she was employed with NYCB. (*Id.* at 117). She told Hamid that she was pregnant about one week before the RIF, and assumes, but does not know, that Hamid told others in retail management. (*Id.* at

114–15).  Ghobrial stated that she has no reason to believe anyone in management knew that she was pregnant before she told Hamid.  (*Id.*)

Before she was terminated, Ghobrial was one of five ABMs in her cluster, which was comprised of four females and one male.  (Mashburn Dec. at ¶ 20).  NYCB's staffing analysis concluded that only one ABM was needed at the 46th Street branch, and Ghobrial was one of two.  (*Id.*)  The other ABM was a male, Oyola, and his Performance Score of 71 was the highest of the ABMs in the cluster.  Ghobrial was the only ABM terminated in the cluster.  Her score of 66 did not qualify her for a transfer.  (*Id.*).  Ghobrial testified that she believed that Oyola should have been terminated because he had a higher salary and had previously left NYCB.  (Ghobrial Tr. at 117–18).  Oyola had the highest salary of the 32 ABMs in their region.  (Mashburn Dec. at ¶ 20).  Nine female ABMs and two male ABMs had higher salaries than Ghobrial; nineteen females and one male had salaries lower than Ghobrial.  (Stratico Ex. H).

### h.  Celeste McCormack

Celeste McCormack ("McCormack") was hired as a part-time teller in July 1995 by Columbia Federal Saving Bank.  (Harrold Ex. P, Sept. 17, 2015 Dep. of McCormack ("McCormack Tr.") at 20).  McCormack eventually became an NYCB employee through corporate mergers and acquisitions.  (*Id.* at 24–25).  She was promoted to various positions and became a BM at the Flushing branch in May 2008.  In January 2010 she went to the Whitestone branch, where she remained until her termination in October 2011.  (*Id.* at 25–26, 32).  The Whitestone branch was located inside a Pathmark supermarket.  (*Id.* at 26–27).

On her three annual performance evaluations in 2009, 2010, and 2011, McCormack respectively received 23.9, 22.85, and 24.25 out of 30; each score indicated that she was meeting

expectations. (Harrold Ex. Q). Each evaluation was prepared by Ramnarine and signed by Careddu. (*Id.*).

McCormack stated that if she met the required goals, she should have received a rating of exceeds expectations and if she was knowledgeable in policies and procedures and made sound decisions, she should have received a rating of exceeds expectations. (McCormack Tr. at 35–36). McCormack testified that she believes that she received her 2009 and 2010 scores both because of her gender and because managers were told to give lower scores. (Harrold Tr. at 29–30, 37–38, 40–41, 47–49). In support of that, she referenced her 2008 evaluation in which she received a 23.975. (McCormack Tr. at 29–30, 37–38). In 2008, a 23.9 would have been considered "exceeds expectations." (Stratico Dec. at ¶ 3; Harrold Ex. Q). She further testified that she heard by "word of mouth" that the performance scores of some male BMs were not as low as hers. (McCormack Tr. at 47–49). She admitted that she did not speak with her Regional Managers or any of the male BMs about their 2010 or 2011 performance evaluation scores. (*Id.* at 48).

As to the directive to lower scores, McCormack said that it did not affect the staff at McCormack's branch because neither McCormack nor her ABM lowered the performance review scores of anyone at the Whitestone branch. (McCormack Tr. at 120–21).

McCormack testified that no one made any negative comments about her gender while she worked at NYCB. (*Id.* at 71). She further stated that she does not know who was involved in making the termination decisions; nor does she know what factors were used to determine who would be terminated; nor does she know to whom she was compared. (*Id.* at 68–69).

Before she was terminated, McCormack was one of 17 BMs in her cluster, which was comprised of 11 females and 6 males. (Mashburn Dec. at ¶ 22). Four female BMs, including

McCormack, and one male BM were terminated. Her performance score made her eligible for rehiring, but she never applied for another position. (McCormack Tr. at 104–05).

The BM with the highest salary in McCormack's region was a female. McCormack's salary was 5th lowest in the region. Her salary was lower than the salaries of 19 females and 12 males and was higher than the salaries of three females and one male. (Mashburn Dec. at ¶ 23).

### i. Leslie Morency

In September 1998, Leslie Morency ("Morency") was hired as a sales associate at the Long Island City branch of a bank that eventually became NYCB. (Harrold Ex. R, Sept. 23, 2015 Dep. of Morency ("Morency Tr.") at 5–6). Morency held various titles at NYCB. In 2008, she received a corporate title of assistant vice president, and in January 2010 she became the BM of the Woodside branch. (*Id.* at 19–20, 28–29).

Morency testified in her deposition that she believes that employee evaluations were changed after employees signed them. (*Id.* at 40). However, the only evidence she had to support this belief was the fact that she was unaware that a warning had been placed in her file prior to August of 2004; and that she had heard through three levels of hearsay that Ramnarine had said that. (*Id.*).

Morency said that she did not give her employees lower performance evaluation scores in response to a directive given to Branch Managers to downgrade evaluation scores. (*Id.* at 46, 51). She further said that she was not instructed by Careddu, Ramnarine or Gonzalez to treat women differently than men in regard to downgrading evaluations. (*Id.* at 55–56).

On her annual performance evaluations in 2009, 2010, and 2011, Morency respectively received 25, 24.05, and 24.85 out of 30. (Harrold Ex. S). Her 2009 score indicated that she was exceeding expectations, and the latter two indicated that she was meeting them. (*Id.*).

On April 20, 2011, Morency received a disciplinary warning notice based on her role in the authorization of an outgoing wire transfer. (*Id.*). Morency testified that even though the policy regarding wire transfers was revised a few days before she signed the authorization, she would have been aware of the revisions. (Morency Tr. 79–80). Morency signed the Outgoing Wire Transfer Authorization form for the wire transfer of $49,500 to Armenia on March 17, 2011. (Harrold Ex. S). The account from which the funds were being transferred did not have sufficient funds for the transfer. (Morency Tr. 82–83). Morency stated that she sent an email to Ramnarine asking her to place a hold on the transfer until the account had sufficient funds. (*Id.* at 84–86). Morency said she referenced the email when she was disciplined. (*Id.* at 86). She wrote in the employee comments section of the warning that "I knew the funds were good however I refused to remove the hold and referred [the customer] for further assistance. I should have made sure that the funds were available prior to signing the form." (Harrold Ex. S).

Morency believed that Wann discriminated against women. (Morency Tr. at 188). She said that she heard "rumors, [] employees talking, what I heard he said concerning women, and the jokes I heard he made about . . . so many female employees." (*Id.*). She did not state explicitly that she believed that any other members of management discriminated against women. She believed nevertheless that Ramnarine, Gonzalez and Satenik Demirdjian were "against" her. (*Id.* at 89–90, 175).

Before her termination, Morency was one of 8 BMs in her cluster, which was comprised of 5 females and 3 males. Her Performance Score of 64 was the lowest of the BMs in the cluster. She had the lowest salary of the BMs in the cluster. Morency and one male BM were terminated from the cluster. (Mashburn Dec. at ¶ 24).

The two BMs in Morency's cluster with the highest salary were females.  Morency's salary was the lowest of the eight Branch Managers in her cluster.  (*Id.* at ¶ 25).

### j.  Monica Ortega

Monica Ortega ("Ortega") was hired by NYCB as a teller at its Merrick branch in April 2005.  (Harrold Ex. T, Oct. 5, 2015 Dep. of Ortega ("Ortega Tr.") at 6).  Ortega worked in various positions at NYCB, and was promoted to ABM of the Valley Stream branch in July 2011.  She held that position until her termination in October 2011.  (*Id.* at 12, 56).

Ortega took maternity leave in August 2006 for the birth of her second child.  Following the child's birth, she requested and was granted the opportunity to both work from home and work as a floater.  (*Id.* at 29).

Ortega received four disciplinary warnings between March 2009 and October 2011.  Three of those disciplinary warnings, issued in March 2009, September 2009, and February 2011, were for teller differences.  (Harrold Ex. U).  The March 2009 warning indicated there had been nine instances of differences with a net underage over $200.  Ortega said that even though the differences in the initial warning may have been someone else's error, as Head Teller she was ultimately responsible for the differences.  (Ortega Tr. at 19).  Ortega testified in her deposition that the differences in the second warning were due to a glitch with the new computer system.  (*Id.* at 23–24).  The disciplinary warning that was not related to teller differences was issued because Ortega withdrew money on behalf of a customer from another customer's account.  (Harrold Ex. U).  The warning stated that Ortega failed to confirm the identity of the customer who asked to withdraw $250 from his account, withdrew it from the wrong account, and compromised another customer's account information by writing the account number on the withdrawal slip she gave to the wrong customer.  (*Id.*).  Ortega stated in her deposition that she corrected the mistake that day

when she realized it. (Ortega Tr. at 25–26). She said that the customer had given her incorrect information. (*Id.*).

On three performance evaluations issued during 2010 and 2011, Ortega received 3.00, 3.00, and 3.80 out of 5. The first two scores indicated that she was meeting requirements, and the final score indicated that she was exceeding them. (Harrold Ex. U). The evaluations were prepared by ABM Jennifer Menza ("Menza") and BM Christine Gruter ("Gruter"). (*Id.*). Ortega testified that Menza and Gruter told her that they were directed by Human Resources to lower the performance scores to threes because they had to match their comments about her performance in the evaluation. (Ortega Tr. 30–31). She stated that she nevertheless thought that Menza and Gruter treated her fairly. (*Id.* at 27–28).

Sometime after January 22, 2011, Ortega applied for the open Assistant Branch Manager position at the Merrick branch. She was not interviewed for the position. Ortega does not know of any NYCB policy requiring that all applicants be interviewed. Albert Cayton received that promotion. (Ortega Tr. at 48–49). Other than that promotion, Ortega has no reason to believe that either Regional Executive Rosa Murciano or Regional Manager Valerie Sheperd discriminated against female employees. (*Id.* at 54).

In June 2011, Ortega told her BM Jean Smith ("Smith") that she was expecting her third child in January 2012. Around that time, Smith recommended that Ortega apply for an open ABM position at the Valley Stream branch. (*Id.* at 43–44). After Ortega told Ms. Smith about her pregnancy, she believes Ms. Smith changed the way she acted with Ortega. (*Id.* at 46–47).

Ortega was promoted to the ABM position at the Valley Stream branch in July 2011. (*Id.* at 56, 62–63). The Valley Stream branch did not have any male employees while Ortega worked there. (*Id.* at 81).

Ortega testified that she has no reason to believe that Wann, Flynn, Fennell, Spano, Camacho or Shannon discriminate against women. (*Id.* at 70–71). She further said that she did not know who made the termination decisions. (*Id.* at 70).

Ortega was terminated at a meeting on October 13, 2011. (*Id.* at 64–65). She believes that one reason she was terminated in October 2011 was to prevent her from reaching seven years of employment and vesting in NYCB's "ESOP." (*Id.* at 93–94).

Before she was terminated, Ortega was one of 6 ABMs in her cluster, which consisted of 5 females and 1 male. (Mashburn Dec. at ¶ 27). Ortega's Performance Score of 43 was the lowest of the ABMs in her cluster. (*Id.*). The lone male had the highest Performance Score. (*Id.*). Ortega and another female ABM, whose Performance Score was 52.76, were terminated. (*Id.*). The next lowest score was 76. (*Id.*).

Of the six ABMs in Ortega's cluster, the two highest paid were females. Ortega had the lowest salary among the ABMs in her cluster. (*Id.* at ¶ 28)

### k. Katia Page

Katia Page ("Page") was hired by NYCB in June 2006 as a teller. (Harrold Ex. V, Oct. 6, 2015 Dep. of Page ("Page Tr.") at 8). When Page was terminated in October 2011, she was an FSA. (*Id.* at 9–11). Page worked at the 26th Street branch in Bayonne, New Jersey throughout her tenure with NYCB. (*Id.* at 11).

Page received three disciplinary warnings between 2009 and 2011—on March 24, 2009; November 13, 2009; and June 11, 2011. (Harrold Ex. W). The first was for failure to follow NYCB procedures regarding teller cash errors; the second was for overpaying a customer $285.20; and the third was for teller differences. (*Id.*).

On her three performance evaluations given to her in 2010 and 2011, Page respectively received 3.85, 3.00, and 3.85 out of 5. (*Id.*). The 3 indicated that she was meeting requirements and the 3.85s indicated that she was exceeding them. (*Id.*). The evaluations were prepared by her BM Audrey Zuckerman ("Zuckerman") and ABM Diana Lewis ("Lewis"). (*Id.*) Page testified that she did not believe that Lewis treated her unfairly, or that either Lewis or Zuckerman discriminated against her because of her gender. (Page Tr. at 21–22, 49). No one in branch management, including Zuckerman or Lewis ever talked to Page about her evaluations in the context of a directive to downgrade. (*Id.* at 31).

Page believes that Lisette Lugo and Janet Grotto discriminated against women because she said that men were chosen for higher positions and only women were in her termination meeting. (*Id.* at 56–57). Page feels that Wann, Joseph Ficalora, Flynn, Fennell, and other NYCB executives favored men because there did not seem to be any men laid off and promotional opportunities went to men. (*Id.* at 57). She further stated that she believed that men like Partiv Dalal and Robert Wasielewski had salaries that were at least equivalent to hers when they did not deserve to make as much as her. (*Id.* at 59–60). When Partiv Dalal resigned from NYCB in July 2011, his salary as an FSA was $25, 150. (Stratico Ex. V). In July 2011, Page's salary as an FSA was $$34,200. (Stratico Ex. L). In October 2011, Robert Wasielewski's salary as an FSA was $28,912 and when he resigned from his employment with NYCB in March 2012 his salary was $29,800. (Stratico Ex. EE). At the time of the reduction in force, Page's salary as an FSA was $35,750. (Stratico Ex. L).

Page does not know who made the termination decisions. (Page Tr. at 54).

When she was terminated, Page was one of 18 full-time FSAs in her cluster—which was comprised of 16 females and 2 males. (Mashburn Dec. at ¶ 30). Page's Performance Score of 44.25 was the third-lowest among the full-time FSAs in that cluster. Six full-time FSAs were laid

off.  The lowest Performance Score among the full-time FSAs who were retained was 64.00.  The two males, who were retained, had Performance Scores of 100 and 83.50.  (*Id.*).  Page's salary of $35,750 was higher than the salaries of the only two male full-time FSAs in her cluster.  (*Id.* at ¶ 31; Stratico Ex. L).

### l.  Candice Petrancosta

Candice Petrancosta ("Petrancosta") was hired as a part-time teller by NYCB in June 2006 to work in NYCB's Clock Tower branch.  (Harrold Ex. X, Sept. 17, 2015 Dep. of Petrancosta ("Petrancosta Tr.") at 17).  She became a full-time teller in February 2007, and she was an FSA when she was terminated in October 2011.  (*Id.* at 33–34).  During her tenure at NYCB, she worked at the Clock Tower and Whitestone branches.  (*Id.* at 33).

On her three annual performance evaluations in 2009, 2010 and 2011, Petrancosta respectively received 3.35, 3.35, and 3.00.  (Harrold Ex. Y).  Each of those scores indicated that she was meeting requirements.  (*Id.*).  The first two evaluations were prepared by Morency and ABM Anita Jeffrey ("Jeffrey"), and the final was issued by Malliet and ABM Rae Rafter ("Rafter").  Although Petrancosta believed that she should have received higher scores, she did not believe that her scores were based on her gender.  (Petrancosta Tr. at 37–40, 43).

In 2010 and 2011, Petrancosta received three disciplinary warnings, each for failing to follow NYCB procedures regarding teller differences.  (Harrold Ex. Y).  Petrancosta testified that she does not know of any male FSAs with teller differences similar to hers who did not receive disciplinary warnings during the time she was at NYCB. (Petrancosta Tr. at 54–55).  She further stated that she did not know any male FSA who made more than she did while she was at NYCB.  (*Id.* at 84–85).

Before she was terminated, Petrancosta was one of 41 full-time FSAs in her cluster, which was comprised of 38 females and 3 males. (Mashburn Dec. at ¶ 33). Petrancosta's salary was higher than the salaries of the three male full-time FSAs in her cluster. (*Id.* at ¶ 34). Petrancosta's Performance Score of 33.25 was the lowest of the full-time FSAs in her cluster. (*Id.* at ¶ 33). 8 full-time FSAs were terminated. The three full-time male FSAs who were retained had Performance Scores of 89.0, 71.25 and 58.5. (*Id.*).

Petrancosta's salary was higher than the salaries of the three male full-time FSAs in her cluster. (*Id.* at ¶ 34).

In December 2010, Petrancosta applied for a BMA position at the Whitestone branch, which would have been a promotion. (Petrancosta Tr. 63–64). This is the only promotion for which Petrancosta applied during her employment with NYCB. (*Id.* at 69)). She believes that Rahat Kabir received it instead of her because of her gender. (*Id.* at 62).

### m. Addolorata Quiles

Addolorata Quiles ("Quiles") was hired as a teller by NYCB in February 2005. (Harrold Ex. Z, Sept. 23, 2015 Dep. of Quiles ("Quiles Tr.") at 11, 13). Quiles eventually became a supervisor, and when she was terminated in October 2011, she was a BMA. (*Id.* at 13).

On her annual performance evaluations in 2009, 2010, 2011, Quiles respectively received 3.25, 3.15, and 3.15. (Harrold Ex. AA). Each scored indicated that she was meeting requirements. (*Id.*). The 2009 and 2011 evaluations were prepared by Lyons and Cappello, and the 2010 evaluation was prepared by Cynthia Sanatass and Cappello. (*Id.*). Quiles believed that each of these evaluations were fair. (Quiles Tr. at 21–24). Quiles heard rumors that BMs were told to lower evaluation scores, but she never knew the reason why and never heard a BM say that. (*Id.* at 26–27).

Quiles received three disciplinary warnings between 2009 and 2011. (Harrold Ex. AA). In June 2009 and September 2011, she received warnings for failure to follow procedures regarding teller differences. (*Id.*). And in April 2010, she received a warning for negligence in connection with an employee's theft of more than $8,000 at the Howard Beach branch, because she had conducted and signed off on an audit of the employee's cash box. (*Id.*). Quiles added a written comment at the end of her disciplinary warning that included: "Going forward I will make sure that I will follow policy and procedures, I will be more thorough & avoid another incident." (*Id.*). Quiles was transferred to the Clock Tower branch for one month, and then returned to the Howard Beach branch. (Quiles Tr. at 38–39).

Quiles heard that Wann is dismissive of women who come to him with a problem and that he wanted most of the women who worked at the Howard Beach branch to be transferred. (*Id.* at 47–50).

No one made any comments to Quiles that she thought were reflective of gender bias while she was at either the Howard Beach branch or the Clock Tower branch. (*Id.* at 51). Quiles believes that Lyons gave Salah special treatment, but she could not recall any examples. (*Id.* at 41–42).

Quiles testified that she does not know who made the termination decisions or how they were made. (*Id.* at 51).

Before she was terminated, Quiles was one of 9 BMAs in her cluster, which was comprised of 8 females and 1 male. (Mashburn Dec. at ¶ 36). Dim, the lone male, had the highest Performance Score in the cluster with 101.75. Quiles' Performance Score of 51.75 was the lowest of the BMAs in the cluster. Quiles had the lowest salary in her cluster, which meant that 7 females had higher salaries. (*Id.* at ¶ 37).

### n. Jacqueline Ramos

Jacqueline Ramos ("Ramos") was hired by Roslyn Savings Bank in December 1993 as a teller. (Harrold Ex. BB, Sept. 15, 2015 Dep. of Ramos ("Ramos Tr.") at 27–28). Ramos became an employee of NYCB when it acquired Roslyn Savings Bank in 2004. (*Id.* at 27). Ramos was promoted to various positions. She was promoted to BM in 1999 and received a corporate title of assistant vice president in 2002. (*Id.* at 28–29). When NYCB acquired Roslyn Savings Bank, Ramos became the BM of the Valley Stream branch. (*Id.* at 43). In March 2006, Ramos was transferred to NYCB's West Hempstead branch as a BM and received a corporate title promotion to second vice president. In 2009 she was transferred to NYCB's Lawrence Branch as a BM where she remained until her termination. (*Id.* at 29).

On November 5, 2008, Ramos was issued a "final" disciplinary warning after it was discovered that branch staff were violating NYCB policies and procedures. (Harrold Ex. CC). The investigation was conducted by NYCB Security in relation to the possible theft of $10,000 by a branch employee. (*Id.*). Ramos admitted in her deposition that the disciplinary warning accurately reflected the NYCB policies and procedures in place at the time of the incident and that the staff at her bank violated those polices. (Harrold Tr. at 34).

On her annual performance evaluations in 2009, 2010, and 2011, Ramos respectively received 24.65, 24.1, and 24.2. (Harrold Ex. CC). Each of these scores indicated that Ramos was meeting expectations. A score of 25 would have indicated that she was exceeding expectation. Ramos testified in her deposition that after her 2009 evaluation, she was told by Executive Regional Manager Rose Murciano and Regional Manager Valerie Sheperd that expectations and performance requirements had changed and that expectations were raised. (Ramos Tr. at 68–69).

On August 31, 2009, NYCB conducted an internal audit of the Lawrence branch, where Ramos was the BM. (*Id.* at 83–84). Ramos testified that audits were routine and that there was nothing unusual about the audit. (*Id.* at 85). The audit report, dated October 28, 2010, stated that "[b]ased on the results of our audit, the Lawrence branch is operating in a manner that needs strengthening." (Harrold Ex. CC). Ramos did not believe that her gender played a factor in the audit. (Ramos Tr. at 87).

Ramos testified that she believes that Valerie Sheperd was partial to the male managers. She cited her transfer from the profitable Valley Stream branch where a male replaced her to the less profitable West Hempstead branch where she replaced a male as evidence of this partiality. (*Id.* at 38–42). She further stated that she felt that Sheperd micromanaged the branches in which Ramos worked. (*Id.* at 46). However, Ramos acknowledged that other females BMs were not micromanaged by Sheperd. (*Id.* at 56–57). Ramos believes that she was targeted by Sheperd because Sheperd told her to arrive at a certain time at her branch when other managers were allowed to come in when they chose; and because Sheperd asked her to stay late after monthly meetings. (*Id.* at 46–51, 59).

Before she was terminated, Ramos was one of 6 BMs in her cluster, which was comprised of 5 females and 1 male. (Mashburn Dec. at ¶ 39). Ramos' Performance Score of 62.25 was the second-lowest of the cluster; and her salary of $68,175 was the second highest in the cluster. (*Id.* at ¶¶ 39–40). Her salary was higher than the only male BM in her cluster. (*Id.*). The four BMs who were retained in the cluster had scores ranging from 89.0 to 102.25. (*Id.* at ¶ 39).

### o. Gelsomina Tierno

Gelsomina Tierno ("Tierno") was hired in July 1976 as a customer service representative by Columbia Federal Savings Bank. (Harrold Ex. DD, Oct. 5, 2015 Dep. of Tierno ("Tierno Tr.")

at 6–7).  Columbia Federal Savings Bank later became Roslyn Savings Bank, which was eventually acquired by NYCB.  (*Id.* at 6).  Tierno worked as an ABM and BM at various NYCB branches.  Her final position was as an ABM at the Holbrook branch.  (*Id.* at 9).

On April 14, 2009, Tierno received a disciplinary warning notice for unsatisfactory performance following an internal NYCB audit of the Commack branch where she was the BM.  (Harrold Ex. EE).  The warning was signed by Regional Manager Maureen Montalbano ("Montalbano").  (*Id.*).  Tierno testified that she did not remember the facts surrounding the notice specifically, but said that at certain times when she was not there, an ABM would have been in charge.  (Tierno Tr. at 22–23).

On January 13, 2010, Tierno received a final disciplinary warning following an audit of the Commack branch employees' time entries.  (Harrold Ex. EE).  The audit and the investigation that followed revealed several policy violations related to employee scheduling and time entries.  (*Id.*).  Tierno stated in her deposition that employees requested that managers use their flex time when they came in late, and that she allowed them to use flex time in those situations.  (Tierno Tr. at 35–36).  The investigation also revealed that in nine weeks during 2009 Tierno had worked less than the minimum requirement of 35 hours.  Tierno admitted in her deposition that there were times when she left early, but that Montalbano was aware when she left early.  (*Id.* at 34).  As a result of the 2010 disciplinary warning, Tierno was demoted from BM to ABM.  (*Id.* at 41).

On her annual performance evaluations in 2009, 2010, 2011, Tierno respectively received 20.15, 21.4, and 22.55 out of 30.  (Harrold Ex. EE).  These scores indicated that she was meeting expectations.  (*Id.*).

Tierno stated in her deposition that she did not have "any issues or problems with Montalbano as her direct supervisor, (Tierno Tr. at 28), but also said that she thought Montalbano

treated her differently because of her gender. (*Id.* at 59). In support of that, Tierno said that Montalbano had a friendly relationship with many male managers. (*Id.*).

Tierno also believed that Debra Hensinger ("Hensinger"), her BM during her final year of her NYCB employment, discriminated against her based on her gender. (*Id.* at 58). Tierno said that she felt that way because Tierno "was making more money than [Hensinger] and [Hensinger] knew. She felt uncomfortable working with me because I was older than her. And she knew me when she was customer service, and I don't know why she would do that." (*Id.*).

Tierno heard that Wann liked to promote male employees over female employees, but did not have firsthand knowledge. (*Id.* at 66). Tierno has no reason to think that Fennell, Spano or Mashburn discriminated against female employees based on their gender. (*Id.* at 67–68).

Before her termination, Tierno was one of 14 employees in her cluster, which was comprised completely of females. (Mashburn Dec. at ¶ 42). Tierno's Performance Score of 44.50 was the lowest of all of the employees in the cluster. (*Id.*). There was one other ABM in the cluster whose Performance Score was 83.50.

Tierno had the highest salary of any ABM in her region. (*Id.* at ¶ 43; Stratico Ex. P). The four females in the region had the four highest salaries.

### p. Samantha Zielinski

Samantha Zielinski ("Zielinski") was hired as a part-time teller by First Savings Bank in June 2001. (Harrold Ex. FF, Sept. 21, 2015 Dep. of Zielinski ("Zielinski Tr.") at 13). NYCB acquired First Savings Bank a few months later, and Zielinski became an NYCB employee. (*Id.*). She was promoted to Assistant Head Teller in 2003, but she returned to a teller position in December 2004 at her own request. (*Id.* at 14–15). Her last position with NYCB was as an FSA.

(*Id.* at 14). Zielinski worked in the various Bayonne, New Jersey branches throughout her NYCB employment. (*Id.* at 16–17).

Zielinski received two disciplinary warnings in 2010. (Harrold Ex. GG). The first, issued on June 7, 2010, was for failure to follow NYCB procedures regarding teller differences. (*Id.*). The second, issued on September 2, 2010, was for failure to follow NYCB's Workplace Appearance and Cellular Phones policies by texting while processing a customer transaction and talking on a cell phone at her teller station during working hours. (*Id.*). Zielinski stated in her deposition that she was aware of these policies and procedures; that the warnings were factually correct; and that she did not believe that she received them because of her gender. (Zielinski Tr. at 22–25).

On her 2009 and 2011 annual performance evaluations, Zielinski respectively received 4.00 and 3.80 out of 5. (Harrold Ex. GG). Both scores indicated that she was exceeding expectations. (*Id.*). The performance evaluations were prepared by BM Audrey Zuckerman and ABM Diana Lewis. (*Id.*). After she was promoted to FSA in 2011, she received a 3.0 out of 3 on her promotional performance evaluation. The score indicated that she was meeting expectations. (*Id.*). Zielinski testified in her deposition that she does not believe that her gender was a factor in her evaluations. (Zielinski Tr. at 18–19, 28, 32).

Zielinski said that she does not know of any reason to be1ieve that Wann, Fennell, Flynn, Spano, Mashburn, Camacho, Zhongcai Zhang or Kevin Kaufman harbored any animosity toward her because of her gender. (*Id.* at 42–43).

Before she was terminated, Zielinski was one of 18 full-time FSAs in her cluster, which was comprised of 16 females and 2 males. (Mashburn Dec. at ¶ 44). Her Performance Score of 52.75 was the fifth-lowest among the full-time FSAs in the cluster; and six full time FSAs,

including Zielinski, were terminated. (*Id.*). The two males, who were retained, had Performance Scores of 100 and 83.50. (*Id.*). Zielinski's salary of $33,800 was higher than the salaries of the two male fulltime FSAs in her cluster, as well as all of the males in her region. (*Id.* at ¶ 45–46).

Zielinski felt that there was gender discrimination at NYCB because she believed males with less experience received promotions over females. (Zielinsky Tr. at 44–46). When asked to give examples, she said that Tony Lopez and Timothy Gosnell ("Gosnell") received positions that she wanted. (*Id.* at 45–46). Specifically, she said that Gosnell received the CSR position that she wanted, and that Tony Lopez was selected for a floating teller position that she applied for some time after March 2009. (*Id.* at 44–46). She further stated that she believed that she was paid less than Timothy Gosnell while they were both working at NYCB's 20th Street branch in Bayonne, New Jersey before March 2009. (*Id.* at 52–53).

Gosnell was hired by NYCB as a full-time Personal Banking Representative in March 2004. He was promoted to Assistant Head Teller at NYCB's 20th Street branch in Bayonne in October 2005. In April 2009, Gosnell was promoted to Branch Management Associate. (Stratico Ex. X).

Zielinski and Gosnell both worked at the 20th Street branch between December 2004 and March 2009. In 2005, Gosnell became Assistant Head Teller. Gosnell's salary for each respective year from 2005 to 2009 was: $22,173.00; $25,750.00; $28,100.00; $29,500.00; and $29,500.00. (Stratico Ex. X). Zielinski's salary for each of those years was: $21.200.00; $26,750.00; $28,100.00; $28,300.00; and $30,800.00. (Stratico Ex. Q).

Tony Lopez was hired by NYCB as a full-time Financial Services Associate on October 12, 2010, which was the position he held until the RIF in October 2011. (Stratico Ex. AA).

Zielinski also believed that Diego Casias, Robert Johnson, Robert Wasielewski and Partiv

Dalal received preferential treatment or higher pay. (Zielinski Tr. at 56, 58–59). Diego Casias resigned from his employment with NYCB on September 7, 2007. (Stratico Ex. U). Robert Johnson left his employment with NYCB on February 11, 2008. (Stratico Ex. Z). Robert Wasielewski's salary as an FSA in August 2011 was $28,912. (Stratico Ex. EE). When Partiv Dalal resigned from his employment with NYCB as an FSA in July 2011, his salary was $25,150. (Stratico Ex. V). Zielinski's salary at that time was $33,800. (Stratico Ex. Q).

In 2010, Zielinski contacted Human Resources about the way she was being treated by co-workers and the Head Teller at her branch. All of the individuals Zielinski complained about were females. Zielinski also complained that BM (and Plaintiff) Zuckerman had not been responsive to her complaint about her co-workers. Zielinski requested a transfer. Human Resources investigated and within 14 days Zielinski was transferred. (Zielinski Tr. at 50–52).

### q. Audrey Zuckerman

Audrey Zuckerman ("Zuckerman") was hired by a corporate predecessor of NYCB in 1995 as a part-time teller. (Harrold Ex. HH, Oct. 6, 2015 Dep. of Zuckerman ("Zuckerman Tr.") at 5). Zuckerman was promoted to various positions at NYCB, and became a BM in 2003. (*Id.* at 6–7). She was BM at the 26th Street branch in Bayonne, New Jersey from 2003 until her termination in October 2011. (*Id.* at 7–8).

On her annual performance evaluations in 2009, 2010, and 2011, Zuckerman respectively received 24.8, 24.35, and 22.30 out of 30. (Harrold Ex. II). Each of these scores indicated that Zuckerman was meeting expectations. (*Id.*). They were all signed by Regional Manager Hamid, and the last two were also signed by Regional Exectuive Lissette Lugo. (*Id.*). Zuckerman thought that her 2009 and 2010 evaluations were mostly fair, but she believed that her 2011 evaluation was lower than it should have been because of the directive to downgrade evaluation scores.

(Zuckerman Tr. at 9, 28–29, 31–32). Zuckerman knew this because she said that sometime in 2010, the Regional Managers informed both the male and female BMs in her region and a neighboring region that they were all "overscoring" employees in their evaluations and had to start lowering the numbers of the score. (*Id.* at 23–24, 27).

Zuckerman received two disciplinary warnings between 2009 and 2011. In July 2009, she received a disciplinary warning for unsatisfactory performance and failure to follow bank procedures during NYCB's conversion to a different computer system. (Harrold Ex. II). A review of transaction reports indicated that two employees failed to fulfill the required number of practice transactions on a certain day. (*Id.*). Zuckerman believed that they had completed the required number. (Zuckerman Tr. at 14, 16–17). In June 2011, Zuckerman received a final disciplinary warning for unsatisfactory performance and failure to follow bank procedures. (Harrold Ex. II). There had been an anonymous call to NYCB Security Department that there was an overage of $2,000 in the vault at Zuckerman's branch, and Zuckerman had not reported the difference. (*Id.*). An investigation and audit was conducted, and it was discovered that several bank policies and procedures were not being followed. (*Id.*). Although Zuckerman disputes the findings of the investigation and audit, Zuckerman has no reason believe the auditor Mindy Santos unfairly targeted people rather than objectively conducted audits. (Zuckerman Tr. at 55–56).

Other than Janet Grotto, who Zuckerman believed was out to get her, Zuckerman did not think that anyone else specifically had any motivation to harm her career at NYCB. (*Id.* at 57–58). However, Zuckerman did say that women might make things up because that's "just the way women are." (*Id.* at 58). Although she did not mention that any specific employee or manager discriminated based on gender, she said that men always received the special projects and that men were paid more. (*Id.* at 102–03). She believed that Jamal Holmes was one of the men who made

more money.  (*Id.* at 102–03).  In October 2011, Zuckerman's salary was $55,135 and Holmes' salary was $48,925.  (Stratico Ex. R, Ex. Y).  When Zuckerman and Holmes were both ABMs, Zuckerman made more money than Holmes; when they were both BMs, Zuckerman made more money than Holmes.  (Stratico Ex. R, Ex. Y).

Zuckerman began a short-term disability leave of absence on August 3, 2011 and did not return to work before the reduction in force in October 2011.  (Zuckerman Tr. at 94–95).  She was notified by phone of her termination as part of the reduction in force.  (*Id.* at 94–95).  Zuckerman continued to receive short-term disability benefits through February 4, 2012.  (*Id.* at 97).

At the time of the RIF, there were four branches in the Bayonne cluster.  (Mashburn Dec. at ¶ 47).  Although at one point in time three BMs managed the four branches, in October 2011, there were only two BMs in the Bayonne cluster—Zuckerman and Ann Hauser ("Hauser").  (*Id.*). NYCB's analysis lead it to believe that one BM could effectively manage all four branches in the cluster.  (*Id.*).  Zuckerman's Performance Score was 52.75 and Hauser's was 58.08.  Zuckerman was terminated and Hauser was retained.  (*Id.*).  The two BMs in the region with the highest salaries were female.  (*Id.* at ¶ 48).  Zuckerman's salary was lower than the salaries of six females and two males; and was higher than the salaries of nine females and two males.  (*Id.*).

### r.  Helen Arniotis

Helen Arniotis was employed by NYCB from May 7, 2001 until October 14, 2011. She was employed as a Teller until June 2010 when she was promoted to FSA. Ms. Arniotis transferred to an FSA Float Pool on May 9, 2011, which was the position she held for the remainder of her employment with NYCB.  (Stratico Dec. at ¶ 38).

### s. Ilene Branfman

Ilene Branfman was employed by NYCB from February 18, 2000 until October 14, 2011. Her final position with NYCB was Assistant Branch Manager of NYCB's Hylan Boulevard branch, a position she had held since April 2006. (*Id.* at ¶ 39).

### t. Claire Byrnes

Claire Byrnes was employed by NYCB as a BM from July 27, 1998 until October 14, 2011. Her final position with NYCB was as a BM at the Bay Ridge branch, a position she had held since October 2010. (*Id.* at ¶ 40).

### u. Geraldine Collins

Geraldine Collins was employed by NYCB from March 8, 2000 until October 14, 2011 . She held various positions at the Westerleigh branch where she worked throughout her employment. Her last position was Assistant Branch Manager, a position she had held since December 2008. (*Id.* at ¶ 41 ).

### v. Dee Cooper Jones

Dee Cooper-Jones was employed by NYCB from December 14, 1998 until October 14, 2011. She held a number of positions before she was promoted to ABM in March 2008. Her final position was ABM at NYCB's Grasmere branch. (*Id.* at ¶ 42).

### w. Gina Decrescenzo

Gina Decrescenzo was employed by NYCB from February 8, 1996 until October 14, 2011. She worked in a number of positions including as an ABM at NYCB's Marine Park branch. At her request, she was demoted to BMA at the same branch in January 2011 and held that position for the remainder of her employment. (*Id.* at ¶ 43).

### x.  Natalie Garnett-Bishop

Natalie Garnett-Bishop ("Garnett-Bishop"), a white woman, was hired as a full-time teller by Roslyn Savings bank on or about December 2, 1991.  (Smith Ex. D, July 9, 2013 Dep. of Garnett-Bishop ("Garnett-Bishop Tr.") at 13).   In 2003, Garnett-Bishop became an NYCB employee when NYCB acquired Roslyn Savings Bank.  (*Id.* at 19).  In 2006, Garnett-Bishop was promoted to a position that was later called a BMA at the Commack branch.  (*Id.* at 15–16).  She worked as a BMA until 2009, when she elected to take an FSA position in a float pool.  (*Id.* at 22–24).  She worked in 19 different branches as a float employee.  (Mashburn Dec. at ¶5).  There were 168 total employees who worked at those 19 different branches.  (*Id.*).  24 employees were terminated out of the 168 in October 2011.  (*Id.*).

Garnett-Bishop's float pool was managed by Montalbano and Eric Lange, with "oversight" from Virginia Belling.  (Garnett-Bishop Tr. at 45–46, 49).  Garnett-Bishop testified in her deposition that Montalbano was "very fair."  (*Id.* at 46).

Garnett-Bishop felt that Virginia Belling ("Belling") and Jeff Gootkin ("Gootkin") were unfair to her during her last two years at NYCB.  (*Id.* at 51, 71–74).  Garnett-Bishop said that Belling was critical of the clothing that Garnett-Bishop wore to the bank on her days off; rolled her eyes at Garnett-Bishop in front of others; and commented that Garnett-Bishop should have sold accounts to a customer who was going through a divorce.  (*Id.* at 52–54, 56–59).  Garnett-Bishop further testified that Belling always found a way to criticize her.  (*Id.* at 69–70).  However, Garnett-Bishop conceded that "everybody . . . shared the same opinion [] about her, that she was [] a little harsh."  (*Id.* at 69–70).  Garnett-Bishop said that Gootkin would only allow her to oversee the smaller of NYCB's two branches located along the Montauk highway.  (*Id.* at 72–73).  She also

claimed that he did not take her seriously and he did not include her in managerial decisions. (*Id.* at 153–54).

On her 2008, 2009, and 2010 annual performance evaluations Garnett-Bishop respectively received 3.55, 3.2, and 3.85 out of 5. (Smith Ex. E). These scores indicated that she was meeting expectations. (*Id.*). Garnett-Bishop testified that she thought that these evaluations were fair. (Garnett-Bishop Tr. at 125–27, 129, 133, 153).

In 2009, Garnett-Bishop received three separate disciplinary warnings. (Smith Ex. E). On March 25, 2009, Garnett-Bishop received a written warning for failure to follow NYCB procedures. (*Id.*). Specifically, Garnett-Bishop approved a $5,000 withdrawal and deposit transaction between the accounts for the same customer as a cash transaction. (*Id.*). Per NYCB policy, the transaction should have been processed as a transfer. (*Id.*). Garnett-Bishop admitted that she violated NYCB policy. (Garnett-Bishop Tr. at 135). On May 21, 2009, Garnett-Bishop received another written warning for failure to follow procedure for again approving a withdrawal and deposit transaction between the accounts for the same customer as a cash transaction. (Smith Ex. E). Garnett-Bishop admitted that she again violated NYCB policy. (Garnett-Bishop Tr. at 136). On September 30, 2009, Garnett-Bishop received a disciplinary warning for a $100 overage in her cash drawer. (Smith Ex. E). The Plaintiff admitted that there was an overage. (Garnett-Bishop Tr. at 145).

From the date Plaintiff became employed by NYCB through February 8, 2011, Garnett-Bishop said that she was not aware of anything that would demonstrate that she was subjected to discrimination on the basis of her age or her race. (*Id.* at 154–55). Aside from her feeling that Gootkin excluded her from managerial decisions while she worked in the Amityville Branch,

Garnett-Bishop conceded that, prior to February 8, 2011, she suffered no other discriminatory treatment on the basis of her gender. (*Id.* at 154).

Garnett-Bishop was terminated on October 13, 2011, at a meeting at the Islandia branch were many employees were informed that they were terminated. (*Id.* at 159–64). Garnett-Bishop believed that she was terminated because of her gender, age, race, and because she made too much money. (*Id.* at 190–91). In support of those contentions, she said that there were many older people in the meeting; there were a lot of white people and only a handful of black and Hispanic employees; and there were not many men in the room. (*Id.* at 190–96, 198). Garnett-Bishop conceded that there were also a lot of people in the room who were younger than her, and that most people that worked in her branches were female. (*Id.* at 193, 196).

Garnett-Bishop had the lowest Performance Score of the FSAs in her float pool region. (Mashburn Dec. at ¶ 6). Garnett-Bishop was the only FSA terminated from her float pool region. (*Id.*). Her float pool region consisted of 9 females and 3 males. (*Id.*). 7 of those FSAs were Caucasian, 3 were Hispanic, 1 was black, and 1 was Asian. 4 of those FSAs were older than her, and those 4 FSAs were retained. (*Id.*). Plaintiff conceded that NYCB retained employees in her float pool region who were Caucasian, female, and older than her. (Garnett-Bishop Tr. at 206–07).

Garnett-Bishop believed that she was replaced by Mary Forbes, Kim Gentile and Carol Abrams. (*Id.* at 202–03). These three individuals are all females. (*Id.* at 203). Mary Forbes was a BMA and Carol Abrams was an ABM. (*Id.* at 202). Kim Gentile was promoted to BMA (*Id.* at 203). NYCB has no record of an employee named Carol Abrams. (Mashburn Dec. at ¶ 7).

## II. DISCUSSION

### A. The Standard of Review

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to

the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence

of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must

be evidence on which the jury could reasonably find for him. *See Dawson v. Cty. of Westchester,*

373 F.3d 265, 272 (2d Cir. 2004).

## B. Relevant Legal Standards

### 1. The Federal and NYS WARN Acts

The Federal WARN Act requires that employers give 60 days notice to its employees prior

to closing a plant or conducting a mass layoff. 29 U.S.C. § 2102(a). This requirement extends to

any employer that employs "(A) 100 or more employees, excluding part-time employees; or

(B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of

hours of overtime)." 29 U.S.C. § 2101(a)(1). A mass layoff is defined as a reduction in force that

> (A) is not the result of a plant closing; and (B) results in an employment loss at the
> single site of employment . . . for (i)(I) at least 33 percent of the employees
> (excluding any part-time employees); and (II) at least 50 employees (excluding any
> part-time employees); or (ii) at least 500 employees (excluding any part-time
> employees).

*Id.* at 2101(a)(3).

The New York State WARN Act requires that employers provide ninety days notice. N.Y.

Labor Law § 860–b(1). "Employer" includes all employers that employ more than 50 full-time

employees, as opposed to 100, NYLL § 860–a(3), and a "mass layoff" is a reduction in force which

> (a) is not the result of a plant closing; and (b) results in an employment loss at a
> single site of employment during any thirty-day period for: (i) at least thirty-three
> percent of the employees (excluding part-time employees); and (ii) at least twenty-
> five employees (excluding part-time employees); or (iii) at least two hundred fifty
> employees (excluding part-time employees).

N.Y. Lab. Law § 860-a(4).

The federal WARN Act does not define a "single site of employment. The Secretary of

Labor issued rules related to the Act, which state that

> (1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.
> (2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.
> (3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.
> (4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.
> (5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.
> (6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i).

The NYS WARN Act similarly stated that in order to determine whether an employment

loss involved a "single site of employment," the following factors apply:

> (i) Several single sites of employment within a single building may exist if separate employers conduct activities within the building. For example, an office building housing 50 different businesses will contain 50 single sites of employment.
> (ii) A single site of employment may refer to either a single location or a group of contiguous locations in proximity to one another even though they are not directly connected to one another. For example, groups of structures which form a campus

55

or industrial park or separate facilities across the street from one another owned by the same employer may be considered a single site of employment.

(iii) Separate buildings or facilities which are not physically connected or are not in proximity to one another may be considered a single site of employment if they are in reasonable geographic proximity, are used by the employer for the same purpose, and share the same staff or equipment. Where an employer has two separate locations in the same geographic area and the purpose of one location is to support the operations of the other location, and this support requires travel between the two locations, the two locations will be considered a single-site.

(iv) Contiguous buildings occupied by the same employer that have separate management, produce different products or provide different services, and have separate workforces do not constitute a single site of employment.

(v) Non-contiguous sites in the same geographic area that have separate management, produce different products or provide different services, and have separate workforces do not constitute a single site of employment.

(vi) The single site of employment for employees whose primary duties require travel from point to point, who are out-stationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad employees, bus drivers, salespersons), shall be the site to which they are assigned as their employer's home base, from which their work is assigned, or to which they report.

N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(p)(1).

## 2. Discrimination Claims Under Title VII, the ADEA and NYSHRL

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §§ 2000e–2(a)(1). The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). This protection extends to employees who are at least 40 years old. *See id.* § 631(a). The NYSHRL provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice . . . for an employer . . . because of an individual's . . . race [or] . . . sex . . . to discriminate against such individual in compensation or in terms, conditions or privileges of

employment." N.Y. Exec. L. § 296(1)(a). "We treat Title VII and [the NYSHRL] discrimination claims as analytically identical, applying the same standards of proof to both claims." *Salomon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226 fn. 9 (2d Cir. 2008). Similarly, ADEA claims are analyzed "under the same framework as claims brought pursuant to Title VII." *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (internal citations and quotation marks omitted). Therefore, this Court will analyze the Plaintiffs' employment discrimination claims under the same standard.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court set forth the burden shifting framework under which employment discrimination claims are analyzed. The plaintiff has the initial burden of proving a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for his termination. *Id.* If the defendant succeeds on its burden, the presumption of animus "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff must then show that the defendant's actions were the result of impermissible discrimination. *Holcomb v. Iona College,* 521 F.3d 130,138 (2d Cir. 2008). "The plaintiff need not prove that the explanation offered by the employer was entirely false 'but only that . . . [the defendant's] stated reason was not the only reason' and that consideration of an impermissible factor 'did make a difference.' " *Phillips v. Dow Jones & Co.,* No. 04 Civ. 5178, 2009 WL 2568437, at *9 (S.D.N.Y. Aug. 17, 2009) (*quoting Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989)).

The Plaintiff's burden at this stage is to prove that "the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v.*

*New York Racing Ass'n.,* 233 F.3d 149, 156 (2d Cir. 2000); *see also Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (courts should examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff") (internal citations and quotation marks omitted)). To defeat the motion for summary judgment the Plaintiff "must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by . . . discrimination." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997).

"[T]rial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life. Ins. Co.,* 92 F.3d 81, 87 (2d Cir. 1996) (internal citations omitted). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant . . . materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Id.*

However, "[a] plaintiff cannot merely rationalize, explain, or disagree with an employer's proffered non-discriminatory reasons to survive summary judgment." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 29 (E.D.N.Y. 2015); *see also Cardo v. Arlington Cent. Sch. Dist.,* 473 F. App'x 21, 23 (2d Cir. 2012) ("While Cardo disputes the specifics of some of the incidents cited by defendants, he does not deny that these incidents occurred, and offers no evidence that the District did not in good faith conclude that he had difficulties getting along with others."); *Woods v. Newburgh Enlarged City Sch. Dist.,* 288 F. App'x 757, 760 (2d Cir. 2008) ("While Woods's claimed misunderstanding of her superior's directive helps explain her exercise of poor judgment, it does not demonstrate the falsity of this non-discriminatory reason for her discharge . . . ." (citing

*Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000))); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), *aff'd* 371 F. App'x 115 (2d Cir. 2010) ("[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

### a. *Prima Facie* Case of Discrimination

To establish a *prima facie* case of employment discrimination, a plaintiff must show that she "(1) is a member of a protected class; (2) was performing [her] duties satisfactorily; (3) was discharged; and that (4) [her] discharge occurred under circumstances giving rise to an inference of discrimination on the basis of [her] membership in the protected class." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

### b. NYSHRL Pay and Promotion Discrimination

The same standards listed above for the claims made under the NYSHRL for discrimination in relation to the Plaintiffs' terminations also apply to their claims for discrimination in relation to their pay and promotion. That is, it is not enough for the Plaintiffs to allege that they were paid less than males, they must show that the difference was based on a discriminatory intent. *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 33 n.2 (2d Cir. 2015) (citing *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999)).

## C. Application to the Facts of this Case

### 1. As to the Plaintiffs' Federal WARN Act Claims

There is no question of fact for a jury to decide regarding the Plaintiffs' Federal WARN claims. The Plaintiffs fail under either of the requirements for a "mass layoff," because less than

500 employees were terminated in the October 2011 RIF, and there is not a "single site" where 33 percent of the employees were terminated. This is true whether the Court treats each individual branch as a single site, each region as a single site, or the New York and New Jersey area as a single site.

None of the Plaintiffs' branches lost 50 or more employees. (Mashburn Dec. at ¶ 51; Mashburn Ex. E). Therefore, if each branch was treated as a single entity, the Plaintiffs Federal WARN Act claims would fail.

Only one of the regions in which the Plaintiffs worked lost more than 50 employees, and that region, Region 1, only lost 22% of its employees. (Mashburn Ex. E).

Finally, although 332 employees were terminated in the October 2011 RIF, that represented only 18 percent of the 1,766 employees that had been by NYCB in New York and New Jersey. (Flynn Dec. at ¶¶ 26–27).

Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiffs' Federal WARN Act claims pursuant to Rule 56 is granted.

### 2. As to the Plaintiffs' NYS WARN Act Claims

The Plaintiffs' NYS WARN Act claims fail for similar reasons. As stated above, whether the Court classified each branch, each region, or the entire New York and New Jersey area as a single entity, none of those groupings lost 33 percent of their workforce.

Nevertheless, the Plaintiffs ask that the Court find that the entire New York and New Jersey region consists of a "single entity" for the purposes of their NYS WARN Act claims because the Act also defines a mass layoff as a reduction in force of 250 or more employees at a single entity. N.Y. Lab. Law § 860-a(4). The Court declines to do so. All of the collective branches in New York and New Jersey did not function as single entities prior to October 2011 pursuant to the

definitions of "single entity" under the NYS WARN Act. Of, importance, the NYS WARN Act explicitly states that "non-contiguous sites in the same geographic area that have separate management, produce different products or provide different services, and have separate workforces do not constitute a single site of employment." N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(p)(1)(iv).

The different regions in New York and New Jersey did not share employees or managers, and therefore the Court declines to find that the entire New York and New Jersey area constituted a single entity for the purposes of the NYS WARN Act. While it could arguably be said that each region was a single site because each region had a float pool of employees, as stated above, none of the regions in which the Plaintiffs worked lost more than 33 percent of their workforce. The Plaintiffs cannot overcome the deficiency in their argument that the New York and New Jersey branches did not share employees or managers or equipment, and they supplied no case law to support their claim that every branch spread out across two states should be considered a "single site" under the NYS WARN Act.

Therefore, no question of fact remains as to the Plaintiffs' NYS WARN Act claims, and accordingly, the Defendants' motion for summary judgment dismissing those claims pursuant to Rule 56 is granted. The Plaintiffs' motion for summary judgment on their NYS WARN Act claims pursuant to Rule 56 is denied.

### 3. As to the Plaintiffs' Employment Discrimination Claims

#### a. As to Whether They Present a *Prima Facie* Case of Discrimination

There is no dispute as to whether the Plaintiffs were each a member of a protected class; performing their respective jobs satisfactorily; or that they were terminated. The crux of the dispute is whether their discharges occurred under circumstances giving rise to an inference of

discrimination on the basis of their membership in the protected class, and if so, whether NYCB has proffered a legitimate, non-discriminatory reason for their termination.

The Court will note that although most of the Plaintiffs received disciplinary warnings and evaluations that stated that they were merely meeting expectations, this does not mean that they were not performing their jobs satisfactorily for the purposes of an employment discrimination analysis. The Plaintiffs need only make a minimal showing at this juncture: that they possessed the basic skills that were necessary to perform the job. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001); *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir. 1991).

Where, as here, the Plaintiffs had already been hired by the Defendant; many of them had been promoted over the course of their tenure; and appear to have performed their jobs well during that tenure, "the inference of minimal qualification is not difficult to draw." *Slattery*, 248 F.3d at 92 (citing *Gregory v. Daly,* 243 F.3d 687, 695–96 (2d Cir. 2001)). The Plaintiffs do not have to prove, at this stage, that they were performing their duties satisfactorily. They must merely prove that they were qualified. *See Chukwurah v. Stop & Shop Supermarket Co., LLC,* 354 F. App'x. 492, 494–95 (2d Cir. 2009) (summary order) (holding that it would be "error to find that plaintiff has not established his *prima facie* case merely because [the] employer was dissatisfied with plaintiff's performance."); *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 172 (2d Cir. 2006) (noting that even if an employer could legitimately determine that the employee's conduct was unacceptable, "these considerations go to the employer's ability to rebut a *prima facie* case . . . , not to the showing of the *prima facie* case itself"); *Slattery*, 248 F.3d at 92 ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."); *Gregory*, 243 F.3d at 696 ("In a discharge case in which the

employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified."). The Court believes that the Plaintiffs have met that burden.

### i. As to Whether the Plaintiffs' Terminations, Salaries, or Career Progress Occurred Under Circumstances Giving Rise to an Inference of Discrimination

To raise an inference of discrimination, a plaintiff must show that his employer "treated [her] less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir. 1999); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir. 1997). The comparable employee(s) "must be similarly situated in all material respects—not in all respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing and quoting *Shumway*, 118 F.3d at 64) (internal quotation marks and emphasis omitted). "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40 (citing *Norville*, 196 F.3d at 96).

Analyzing the undisputed facts, which the Court notes were derived mostly from the Plaintiffs' depositions, the Court finds that the Plaintiffs have not shown that each of the seventeen Plaintiffs who have employment discrimination claims were treated differently than men who were similar in all material aspects, or that Garnett-Bishop was treated differently than men, individuals who are not Caucasian, or younger people who were similar in all material aspects.

First, in each and every one of the Plaintiffs' individual cases, other females were retained in their cluster and their region. In Garnett-Bishop's case, there were Caucasians who were retained; there were women who were retained; and there were older employees who were retained. This fact alone diminishes the Plaintiffs' prospects for raising an inference of employment discrimination. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (finding that where the defendants had retained employees who were of the same gender as the plaintiff and who were older than she was, "no inference of age or gender discrimination can be drawn."); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 118 (2d Cir. 1991) (finding the retention of three older employees relevant to the plaintiff's age discrimination claim). Therefore, the fact that other individuals in the Plaintiffs' protected classes were retained weighs against a finding of an inference of discrimination.

Second, in the same way that "a generalized statistical analysis of selections in a RIF can provide circumstantial evidence of an inference of discrimination in support of a *prima facie* case, as a matter of law," *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 374 (S.D.N.Y. 2013) (citing *Zito*, 869 F. Supp. 2d at 395), statistics can show that plaintiffs do not present a *prima facie* case. In this case, before the October 2011 RIF, NYCB employed 332 males and 1,434 females in their New York and New Jersey branches. (Flynn Dec. at ¶ 27). That meant that 18.8 percent of the employees of the branches in those two states were male, and 81.2 percent were female. NYCB terminated 42 males and 278 females. That meant that of the employees who were terminated, 13 percent were male and 87 percent were female. The New York and New Jersey workforce after the October 2011 RIF consisted of 290 males and 1156 females, which meant that the post-RIF workforce was 20 percent male and 80 percent female. The percentage of females in the NYCB workforce in New York and New Jersey therefore went from 81.2 percent to 80 percent.

These statistics, while not determinative, weigh against an inference of discrimination. *See Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 107 (2d Cir. 1989) (finding that any inference of discrimination plaintiff claimed flowed from the retention of the six men while she was dismissed was nullified by evidence that a total of 45 managers, both men and women, were discharged pursuant to a reduction-in-force, while four men and four women were retained).

Third, because the majority of employees at NYCB were female, every Plaintiff had at least one female direct supervisor. Some had two. And since the direct supervisors completed the Plaintiffs' annual performance evaluations and issued their disciplinary warnings, and those were used in determining the Plaintiffs' Performance Scores, the direct supervisors therefore directly impacted the Plaintiffs' termination. This also weighs against a finding that the Plaintiffs' terminations occurred under circumstances giving rise to an inference of discrimination. *See Zito*, 869 F. Supp. 2d at 395 (stating that the fact that the decision maker in the RIF was within the plaintiff's two protected classes of gender and age precluded an inference of age or gender discrimination); *Davis v. Peake*, No. 08 CIV. 3570 KTD, 2011 WL 4407551, at *7 (S.D.N.Y. Sept. 22, 2011), *aff'd*, 505 F. App'x 67 (2d Cir. 2012) (holding that the plaintiff could not establish an inference of discrimination where the ultimate decision maker and those that interviewed him for the job were within the protected class); *DiGirolamo v. MetLife Grp., Inc.*, No. 10 CIV.1537 RMB, 2011 WL 2421292, at *11 (S.D.N.Y. June 6, 2011), *aff'd,* 494 F. App'x 120 (2d Cir. 2012) (holding that where decision makers were also in the plaintiff's protected class, the inference of discrimination was weakened); *Browne v. CNN Am., Inc.,* No. 98 Civ. 1768, 1999 WL 1084236, at *4 (S.D.N.Y. Dec. 1, 1999) ("The fact that . . . the ultimate decision maker[ ] was a member of the [same] protected class [as Plaintiff] enhances the inference that age discrimination was not the

motive behind . . . [the] termination of [Plaintiff]."), *aff'd,* 229 F.3d 1135 (2d Cir. 2000); *Williams v. Brooklyn Union Gas Co.,* 819 F. Supp. 214, 225 (E.D.N.Y.1993) (dismissing federal and state age discrimination claims where the employees responsible for the plaintiff's termination were older than plaintiff or approximately the same age).

Although the direct supervisors were not ultimately the one who decided who was terminated in the RIF, the Plaintiffs have argued that the evaluations and warning were issued to females as a pretext to later have them terminated. The fact that the Plaintiffs' supervisors were female greatly weakens this argument. One of the direct supervisors who issued warnings and evaluations to many of the Plaintiffs here, Donna Cappello, is also a Plaintiff.

Furthermore, almost every Plaintiff said that they did not believe that gender affected their performance evaluations or their disciplinary warnings. If those items carried weight in their Performance Scores which were used to determine whether they would be terminated, then gender did not play a part in their termination either. Only four of the eighteen Plaintiffs with employment discrimination claims testified in their depositions that they believed that their gender affected their scores. Byrnes said that she thought gender affected her score because everyone she spoke to who thought they should have received a higher score was a woman. This is not evidence of anything, especially in light of the fact that 80 percent of NYCB's workforce was female. Falco believed that she received lower scores because of her gender, but was unable to identify any male tellers who received higher performance evaluations scores at her branch at that time. Ghobrial believed one of her performance scores was based on gender because a male said that males received the scores they deserved. However, Ghobrial did not know what scores these other males received. McCormack's belief that gender affected her score was also based on "word of mouth,"

and no evidence or actual knowledge. Each of the four Plaintiffs who believed that gender affected their scores based those beliefs on feelings or hearsay, not on evidence.

In the undisputed facts, only two of the Plaintiffs claimed that there were similarly situated males who were not terminated. This fact severely weakens any possibility of refuting the Defendants' proffered non-discriminatory reasons. Berchiolli and Byrnes both said that Salah should have been terminated instead of them. However, Berchiolli admitted that Salah was in a different cluster, and Byrnes admitted that she knew nothing about Salah. These facts show that there is no evidence that Salah was similarly situated to either Berchiolli or Byrnes. *See Gupta v. N.Y. City Sch. Constr. Auth.,* 305 F. App'x. 687, 689 (2d Cir. 2008) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Sharpe*, 684 F. Supp. 2d at 405 ("[plaintiff] does not present any concrete facts regarding the training, qualifications, or abilities of the retained employees. Indeed, [plaintiff] does not provide any evidence regarding [her] comparators' education, years of service, or annual reviews. [Plaintiff's] speculation about [her] former colleagues' qualifications is thus insufficient to raise an inference of discrimination."). The other Plaintiffs, including Garnett-Bishop, did not present any comparators who were not terminated to raise a suspicion of discrimination. The Court cannot say that there was discrimination if there is there is nothing from which to infer discrimination.

As to their salaries, the Plaintiffs are unable to point to evidence of discriminatory intent. As stated above, under Title VII or the NYSHRL, it is not enough to merely point to the fact that members outside of a protected class allegedly made more money, the Plaintiffs must show that there was discriminatory intent behind the alleged pay disparity. Only a handful of the Plaintiffs pointed to examples of males who allegedly made more money. Two of the Plaintiffs, Alexander

and Tierno, made the most of anyone in their position in their cluster or region. Four Plaintiffs, McCormack, Morency, Ortega, and Zuckerman, worked in regions or clusters where females made the most of those in their position. Seven of the Plaintiffs, Byrnes, Falco, Ghobrial, Page, Petrancosta, Ramos, Zielinski, made more than any male in their region or cluster. Four of the Plaintiffs, Berchiolli, Cappello, Cassidy, and Quiles, were paid less than both males and females. However, Cappello had the second highest salary of any ABM in all of the branches in New York and New Jersey, and even made more than many BMs. The Court is unable to say that there is any evidence of discriminatory intent where the Plaintiffs either made the most of any employee of their rank in their cluster or region; made more than males similarly situated; worked in a grouping in which a female made more than any other individual; or where they were paid less than both males and females.

The five Plaintiffs who listed actual names of males who they believed were paid more than them were incorrect in those beliefs. Alexander, Byrnes, Zuckerman, Page, and Zielinski all gave at least one name of a male who they thought unfairly made more than they did. Despite the fact that not all of these Plaintiffs described how they were similarly situated or that there was any evidence of discriminatory intent, the payroll records illustrated that in each instance, the male made less than the female Plaintiff. Where those who are claiming discrimination actually made more money than those to whom they seek to be compared, there is no evidence of discriminatory intent. *See Talwar*, 610 F. App'x at 33 n.2 (stating that plaintiffs must allege that they made less money than those outside of the protected class due to discrimination). Therefore, the seventeen Plaintiffs who alleged that their salaries were the result of gender discrimination failed to make a *prima facie* showing that their salaries occurred under circumstances giving rise to an inference of discrimination.

As to any claims that NYCB discriminated against the Plaintiffs when they asked for promotions, the undisputed facts show that only five Plaintiffs raised specific instances of discrimination, and none of them provided any facts to support an inference of discrimination. Specifically, Alexander said that Gosnell received a promotion over her, but he held a more senior position than Alexander when they applied; Byrnes did not offer any facts to support an inference of discrimination that she should have been chosen over Amin; Ortega was passed up for an ABM position in January 2011, but she received a promotion to ABM nevertheless six months later; Petrancosta alleged that a male received a BMA position over her, but there are no facts to suggest that the male received the promotion under circumstances giving rise to an inference of discrimination; and the male who received the promotion over Zielinski was in a position senior to hers when they applied.

Of importance, nowhere in the undisputed facts do the Plaintiffs provide reasons for why they were qualified for the positions to which they applied or as qualified as the males to whom the positions were given. "[A] plaintiff cannot establish a *prima facie* case based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" *Brown v. City of N.Y.*, No. 14-cv-2668, 2014 WL 5394962, at *6 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 622 F. App'x 19 (2d Cir. 2015), and *aff'd*, 622 F. App'x 19 (2d Cir. 2015) (quoting *Tanvir v. NY. City Health & Hosps. Corp.,* 480 F. App'x 620, 622 (2d Cir. 2012) (summary order)); *see also Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013) (summary order) ("[The plaintiff] points to no evidence from which a factfinder could reasonably infer that the decision not to promote her was related to her gender, nor does she submit evidence that similarly situated men were treated differently." (citing *Shumway,* 118 F.3d at 64 (stating that, absent direct evidence, the fourth element of *prima facie* case requires plaintiff to show that she was treated differently from

"similarly situated" males)).  The Plaintiffs failed to produce evidence in the undisputed facts that they were similarly situated to the males to whom they compared themselves.

Therefore, the Court finds that the Plaintiffs have only provided conclusory allegations that do not support an inference of discrimination.  "In the context of [an employment] discrimination claim, a plaintiff must allege facts 'sufficient to plausibly suggest a defendant's discriminatory state of mind' and conclusory allegations are not entitled to the presumption of truth." *Zito*, 869 F. Supp. 2d at 394 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 677–81, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal alterations omitted)); *see also Patane v. Clark,* 508 F.3d 106, 112 (2d Cir. 2007) (affirming dismissal of the plaintiff's employment discrimination claims because "she failed to plead any facts that would create an inference that any [adverse] action taken by . . . [any] defendant was based upon her gender.") (bracketed text in original). "The sine qua non of a gender-based discrimination action claim . . . is that the discrimination must be because of sex." *Id.* at 111.

Accordingly, the Defendants' motion for summary judgment pursuant to Rule 56 dismissing all of the Plaintiffs' employment discrimination claims is granted.  Nevertheless, the Court will address whether the Defendants have offered legitimate non-discriminatory reasons for the Plaintiffs' terminations.

### b.  As to Whether the Defendants Have Offered Legitimate, Non-Discriminatory Reasons for the Plaintiffs' Terminations

Even if the Court were to find that the Plaintiffs presented a *prima facie* case of discrimination, the Plaintiffs have not presented any evidence that the Defendants' proffered reasons for the Plaintiffs' terminations were pretext.

A plaintiff may still prevail "upon a showing that the employer's given legitimate reason is unworthy of credence, that the reason supplied was not the true reason for the unfavorable

employment decision." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988). The Supreme Court has said that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 515–16 (emphasis in original).

The Plaintiffs are unable to show that the Defendants' stated reasons are false or that discrimination was the real reason. The Plaintiffs are unable to show that the Performance Scores did not determine who would be terminated, and they are unable to point to similarly situated males who were either not evaluated or disciplined similarly, or who were retained.

The Defendants' proffered explanation for why they terminated each of the Plaintiffs is that they either had the lowest Performance Scores of individuals to whom they were compared, or they had among the lowest scores. Performance Scores were determined using employees' recent disciplinary history, performance evaluation scores, audits of the branches in which they worked, and special skills. (Mashburn Tr. at 11–19). The Defendants said that gender was not taken into account, and there is no evidence that gender was taken into account. As stated above, the Defendants' contention that gender was not taken into account is borne out by the numbers.

In the Court's view, all of these terminations were the result of business decisions made by the Defendants, and "[a]n employer's decisions are given deference by the court unless they are clearly pretextual." *Warren v. N. Shore Univ. Hosp.,* No. CV–03–0019, 2006 WL 2844259, at *8 (E.D.N.Y. Sept. 29, 2006); *see also Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 483 (S.D.N.Y. 2013) ("[T]he law is clear that courts should not second-guess an employer's reasonable business judgment regarding personnel matters." (citing *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010); *Zito*, 869 F. Supp. 2d at 396 ("the Plaintiff cannot establish pretext by disagreeing with the Defendant's assessment of its business and the effect of

economic conditions."); *Kawalkowski–Kojac v. Otto Oldsmobile–Cadillac, Inc.,* No. 06–1527(GLS/DRH), 2009 WL 667427, at *4 (N.D.N.Y. Mar. 10, 2009) (refusing to find pretext because the court is not a "business manager that counsels entities as to how to run a business," and stating that an employer's restructuring process is a business decision to be made by the employer.); *Fahmy v. Duane Reade, Inc.,* No. 04–1798, 2006 WL 1582084, at *7 (S.D.N.Y. Jun. 9, 2006) ("[I]t is not the function of a fact-finder to second-guess business decisions." (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988)).

This is especially true in an RIF where the Defendants have explained the termination decision-making process. *See, e.g., Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 483 (S.D.N.Y. 2013) ("It is well-settled in the Second Circuit that a reduction in force in response to economic and budgetary concerns constitutes a legitimate, non-discriminatory employment action in the context of the McDonnell Douglas burden-shifting framework." (quoting *Garcia v. Henry Street Settlement*, 501 F. Supp. 2d 531, 540 (S.D.N.Y. 2007) (internal quotation marks and alterations omitted))); *Ko Sheng Chuang v. T.W. Wang, Inc.*, 647 F. Supp. 2d 221, 234 (E.D.N.Y. 2009) ("Inevitably, in the course of a restructuring, employers must choose among employees as to who will be terminated. In so doing, it is both lawful and consistent with common sense for an employer to choose employees who engaged in misconduct or whose performance and qualifications are lacking relative to other employees."); *Sgarlata v. Viacom, Inc.,* Nos. 02–7234(RCC) and 03–5228(RCC), 2005 WL 659198, at *7 (S.D.N.Y. Mar. 21, 2005) (granting employer summary judgment where plaintiff was terminated as part of a department-wide RIF and his job duties were absorbed by those co-workers that remained, where plaintiff only offered his own belief that he was discriminated against); *Pisana v. Merrill Lynch & Co.,* No. 93–4541(LMM), 1995 WL 438715, at *3–5 (S.D.N.Y. July 24, 1995) (recognizing

that courts place a greater burden on plaintiffs terminated as part of a reduction-in-force to prove an intent to discriminate); *Donaldson v. Merrill Lynch & Co.*, 794 F. Supp. 498, 504 n.3 (S.D.N.Y. 1992) ("[t]he essence of a RIF is that competent employees who in more prosperous times would continue and flourish with a company may nevertheless have to be fired.") (internal citations and quotation marks omitted).

The crux of the Plaintiffs' arguments is that they disagree with the manner in which NYCB conducted its RIF. For examples, the Plaintiffs argue that "no consideration was made for the differing conditions in the branches . . . . Rather, all employees were compared in a relative vacuum . . . . This employee comparison was not fair . . . ." (Pl.'s Mem. of Law in Opposition at 27, ECF No. 140); NYCB failed to conduct surveys to see who spoke two languages (*Id.* at 32); or that employees did not know that licenses would make them more attractive for retention (*Id.*). The Plaintiffs' arguments are also littered with "[plaintiff] believes," or "plaintiff feels." Beliefs and feelings are not evidence. They are conjecture. "Plaintiffs' personal beliefs of their qualifications are insufficient to support a claim of intentional discrimination." *O'Sullivan v. N.Y. Times*, 37 F. Supp. 2d 307, 319 (S.D.N.Y. 1999). Furthermore, without any evidence of discrimination, the Court will not substitute the Defendants' business judgment with its own.

Therefore, the Court finds that even if the Plaintiffs had presented a *prima facie* case of discrimination, that the Defendants have satisfied their burden in providing legitimate, non-discriminatory reasons for the Plaintiffs' terminations. Accordingly, the Defendants' motion for summary judgment pursuant to Rule 56 dismissing the Plaintiffs' employment discrimination claims brought pursuant to Title VII, the ADEA and the NYSHRL is granted.

## III. CONCLUSION

Accordingly, for the reasons stated above, the Defendants' motion for summary judgment pursuant to Rule 56 dismissing all of the Plaintiffs' claims is granted, and the Plaintiffs' motion for summary judgment on their NYS WARN Act claims is denied. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED:**

Dated: Central Islip, New York

March 2, 2017                                    ___*/s/ Arthur D. Spatt*___

ARTHUR D. SPATT

United States District Judge